AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of Delaware

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Robert L. Higgins | ) Case No. |
| | ) 23-263M |
| | ) |
| | ) <span style="color:red">REDACTED</span> |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 20, 2023 and May 15, 2023__ in the county of __New Castle__ in the

_____ District of __Delaware__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1621 | Perjury |
| 18 U.S.C. § 1623 | False Declaration Before Court |
| 18 U.S.C. § 1512(b)(1) & (b)(2) | Attempted Witness Intimidation |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

*Antonio Lo Piccolo*
_____
*Complainant's signature*

SA Antonino Lo Piccolo, IRS-CI
_____
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P.4.1 and 4(d).

Date: __06/10/2023__

_____
*Judge's signature*

City and state: __Wilmington, Delaware__

Hon. Sherry R. Fallon, U.S. Magistrate Judge
_____
*Printed name and title*

Print     Save As...     Attach     Reset

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELWARE

IN THE MATTER OF A CRIMINAL
COMPLAINT AGAINST ROBERT L.
HIGGINS

Case No. 23 – 263M

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Antonino Lo Piccolo, Special Agent, United States Department of Treasury, Internal Revenue Service Criminal Investigation ("IRS-CI"), being duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a criminal complaint charging Robert L. Higgins, hereinafter "Higgins," with violations of Title 18, United States Code, Section 1621 (Perjury),[1] Title 18, United States Code, Section 1623 (False declaration before court),[2] and Title 18 United States Code Sections 18 U.S.C. § 1512(b)(1) & (b)(2) (Attempted Witness Tampering and Intimidation).[3]

---

[1] Section 1621 reads, in relevant part:  "Whoever...having taken an oath before a competent tribunal, officer , or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify...truly ...willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true...is guilty of perjury and shall...be...imprisoned not more than five years."

[2] Section 1623 reads, in relevant part:  "Whoever under oath...in any proceeding before...any court...of the United States knowingly makes any false material declaration...shall be ...imprisoned not more than five years."

[3] Section  1512(b)(1) & (2) reads in relevant part:  "(b)Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

2.      I am employed as a Special Agent ("S/A") with IRS-CI, and have been since August 19, 2004.  I received a Bachelor of Science Degree in Accounting from the Pennsylvania State University in 1999.  I am currently assigned to the Philadelphia Field Office, Newark, Delaware, post-of-duty.  My experience as an IRS-CI S/A has included the investigation of cases involving criminal violations of the Internal Revenue Code, Title 26, United States Code; the Bank Secrecy Act, Title 31, United States Code; and Money Laundering, Title 18, United States Code, Sections 1956 and 1957.  I have participated in investigations involving wire fraud, bank fraud, mail fraud, and theft from government programs.

3.      I graduated from the Federal Law Enforcement Training Center ("FLETC") on February 11, 2005.  There I received instruction on investigative techniques and searches and seizures.  I have been trained in the execution of financial search warrants resulting in the seizure of financial documents, United States currency, and tax-related documents.  As a federal agent, I am authorized to investigate violation of laws of the United States, including the crimes outlined herein, and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

---

(1)influence, delay, or prevent the testimony of any person in an official proceeding; [or]
(2)cause or induce any person to—
        (A)withhold testimony, or withhold a record, document, or other object, from an official proceeding;
        …
        Shall be fined under this title or imprisoned not more than 20 years, or both."

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1621, Title 18, United States Code, Section 1623, and Title 18, United States Code, Sections 1512(b)(1) & (2) have been committed by the Defendant Robert Higgins (hereinafter the "Defendant" or "Higgins").

## **PROBABLE CAUSE**

### *Introduction*

6.      As explained in more detail below, Higgins is currently pending as a defendant in the United States District Court in the District Court for the District of Delaware, as he was indicted on August 11, 2022 by a grand jury with multiple counts of tax evasion and wire/mail fraud.   The case is assigned to the Honorable Maryellen Noreika, United States District Court Judge, case number 22-CR-44.

7.      As also explained in more detail below, there is a pending civil case against Higgins brought by the Commodity Futures Trading Commission, assigned to the Honorable Richard G. Andrews, case number 22-cv-1266.  In September 2022, a Statutory Restraint Order was issued by Judge Andrews, which required Higgins to turn over possession and custody of all assets to a Temporary Receiver. The order further restrained and enjoined Higgins from withdrawing, transferring, removing, dissipating or otherwise disposing of any assets. The effect of this order was that Higgins should not physically possess and deal in gold or other precious metals.

8.      There is probable cause to believe that Higgins committed perjury during a court hearing on April 20, 2023 (the "April 20 hearing" or the "hearing"), when Higgins was under oath and questioned about his financial situation by the Honorable Maryellen Noreika. Specifically, Higgins testified that he owned no gold, silver, or other precious metals and that none was available

3

to him in any way. He also testified that he did not own a car and that none was available to him. Finally, Higgins also made a number of other statements about his financial condition that are flatly contradicted by subsequent evidence obtained by law enforcement.  In addition, Higgins then subsequently engaged in multiple activities that your affiant submits were calculated to intimidate a government witness that Higgins first learned at the April 20 hearing had provided information to the government.

### ***Background of Robert L. Higgins US District Court Indictment***

9.      On August 11, 2022, Higgins was indicted in the United States District Court for the District of Delaware on five counts of tax evasion in violation of Title 26, United States Code, Section, 7201, two counts of mail fraud in violation of Title 18, United States Code, Section 1341, and six counts of wire fraud in violation of Title 18, United States Code, Section 1343.

10.      The indictment alleged that Higgins owned and operated at 100 Todds Lane, Wilmington, DE 19802, businesses involved in the purchase, sale, and storage of precious metals: First State Depository Company, LLC; Certified Assets Management, Inc.; Certified Assets Management International, LLC; and Argent Asset Group, LLC.

11.      First State Depository Company, LLC ("FSD") was a precious metals depository with a vault.  FSD offered storage services to investors in the precious metals markets.

12.      Certified Assets Management, Inc. ("CAMI") and Certified Assets Management International, LLC ("CAM-INT") each offered services involving precious metals, including the purchase and sale for investors.  Each operated in 2012, but discontinued operating in approximately 2013.

13.     Argent Asset Group, LLC ("Argent") began operating in 2013, replacing CAMI and CAM-INT and also offered services in the precious metal market, including the purchase and sale for investors.

14.     The indictment alleges that from approximately 2012 through 2019, Higgins devised and intended to devise a scheme and artifice to defraud Victim 1. In summary, in 2012, Higgins accepted approximately $1.2 million from Victim 1 for the purchase of silver. In return, Higgins promised to use Victim 1's money to purchase and store silver for Victim 1. In 2015, at Victim 1's request, an employee of Defendant Higgins returned to Victim 1 approximately $250,000, otherwise Higgins never returned to Victim 1 any of the approximate $828,000 owed to him.  As explained in more detail below, an unrelated investigation into Higgins by the CFTC has uncovered that under Higgins' ownership, Higgins' businesses are short more than $50 million in precious metals promised to customers.

### *Sworn Testimony Before Judge Noreika*

15.     On April 20, 2023 the Honorable Maryellen Noreika ordered Higgins to appear for a hearing regarding Higgins' finances as he filled out an affidavit alleging he was indigent and required court appointed counsel.  At the outset of the hearing, Judge Noreika stated, in part:

> I scheduled this because I have some further questions about Mr. Higgins' financial eligibility for CJA funds.
>
> *      *      *
>
> I went back and reviewed Mr. Higgins' financial affidavit… Of note, Mr. Higgins lists a $900,000 asset in his house, and additional assets of more than $10,000 in personal property.  And I note that although his affidavit states that he has no income since 2012, other documents indicate regular family trips to Costa Rica and Belarus since that time.  All this is giving me pause about the extent of Mr. Higgins' financial situation and whether he is financially eligible for

5

appointment of counsel and even if so, whether given his resources he should be required to contribute to some extent to his defense rather than leave it all to the public.

I have an obligation to ensure that limited CJA funds are used properly and not used if the defendant is not financially eligible. So what I propose to do is exercised my right to review the request for appointment of counsel and to do that by placing Mr. Higgins under oath and asking him some questions about his financial situation. *See* Exhibit A, p. 3-5.

16.     Higgins then was placed under oath. *See* Exhibit A, p. 6. In response to questions asked by Judge Noreika, Higgins testified that he received $2,500 in monthly social security benefits. *See* Exhibit A, p. 7-9. He testified that he and his wife each were 50% owners of the home, which they owned free and clear of any mortgage: however, there was a judgement against the house and he was not able to sell it or take any of the equity in it. *See* Exhibit A, p. 10.

### Testimony Regarding a Car

17.     Judge Noreika then addressed whether the Defendant had access to a car.

**THE COURT**: Do you own a car?

**THE DEFENDANT**: I do not.
**THE COURT**: Do you drive?
**THE DEFENDANT**: Up until a few days ago I did not have a driver's license. So I now have the capacity to drive, but the vehicle that I drove is the H2 that the CFTC basically took possession of.
**THE COURT**: All right. So if you drive now, if you were to drive now, what car would you drive?
**THE DEFENDANT**: That's what I'm working on, I need to get a car.
**THE COURT**: You don't have a car that's available to you?
**THE DEFENDANT**: Right.

Transcript, attached as Exhibit A, pages 10-11.

### Testimony About Paying for Trips

18.     Higgins then testified about annual family trips to Belarus but said there were no associated lodging or airline expenses because they stayed with his wife's family and the flights were paid with milage points.  Higgins testified that the family traveled to Costa Rica for nine days in June 2022 but that the trip was paid with hotel and airline points accumulated from business travel.  Higgins testified that his family spent 14 days in Maui in December of 2022 and similarly said the trip was paid with hotel and airline points ("we were in Maui, again with Hyatt points staying at a Hyatt hotel.").  Exhibit A, p. 16-17.   Thereafter, Judge Noreika asked specifically about Hawaii, including whether the Defendant had interest in a time share in Hawaii:

> **THE COURT**:  Do you have any property interest in a time share in Hawaii?
> **THE DEFENDANT**: The time share in Hawaii that we have, basically we have not made any payments, I'm going to say for the last five years, and I have been waiting for the day they basically say, hey you're not paying us.
>
> ***
> I can tell you that yes, we did commit to a time share, we did pay for a short while, and then 2012 there was nothing we could do and so we have been going back visiting, going there, spending the fourteen days there, but have not paid a cent for it.

Exhibit A, pp. 23-24.

### Testimony about Access to Precious Metals

19.     Thereafter, Judge Noreika then returned to Higgins' assets:

> **THE COURT**: Do you have any gold, silver, or other precious metals that you own or that is available to you in any way?
> **THE DEFENDANT**:  I do not.
>                              *   *   *
>
> **THE COURT**: Does your wife own any property other than your half interest in the house?
> **THE DEFENDANT**:  No, she does not.
> **THE COURT**: Does your wife own any precious metals of any kind?
> **THE DEFENDANT**:  No, she does not, never has.

7

*See* Exhibit A, p. 25.  Near the end of the hearing, Judge Noreika instructed Higgins to file a revised

financial affidavit which included a meaningful Social Security disclosure.  *See* Exhibit A, p. 26-

27.  Defense Counsel then volunteered that counsel's legal fees were paid by Higgins before the

CFTC froze all of his assets in October of 2022.  Judge Noreika responded:

> **THE COURT**: Yes, I understand, but in December he went to Hawaii for fourteen
> days.  Most criminal defendants who are using - - whose counsel is being paid for by the
> public are not in Hawaii for fourteen days.

 *See* Exhibit A, p. 27.

### *Testimony Regarding Gifts*

20.     During the hearing, Higgins also testified that he had not given any gifts within the

last 12 months.

> .**THE COURT**: Have you given any gifts to anyone including a family member in
> the last twelve months?
> **THE DEFENDANT**:  I guess that depends on the definition of gifts.
> **THE COURT**:  Think of it broadly.

> Higgins then referenced $20 birthday presents to his grandchildren..

> **THE COURT**: Okay.  So other than birthday presents to your grandchildren, any
> other gifts you have given?
> **THE DEFENDANT**:  No.
> **THE COURT**: Wife, current child, any gifts?
> **THE DEFENDANT**:  No.

Transcript, attached as Exhibit A, pages 17-18.

21.     During an interview with an FSD employee in April 2023, the employee

(hereinafter "Witness 1") stated that around May 2022, Higgins provided her $25,000 in cash to

pay off credit card debt.  According to Witness 1, Higgins had told her that no one would find out

about the money and to make sure Higgins' wife would be okay. This event took place shortly

8

after Higgins had been initially indicted on four counts of tax evasion and also after Higgins had

been driving on a suspended license and was involved in a vehicle crash which resulted in the

death of an occupant in the other vehicle.  The employee told law enforcement that she had recently

been in text message communication with Higgins via his cellular telephone.

22.     Given the Defendant's testimony that he had not given any gifts, a government

prosecutor at the hearing alerted Judge Noreika to the statement of Witness 1 without disclosing

Witness 1's identity.  Specifically, when Judge Noreika asked the government if it had anything

to add, the government prosecutor stated:

> **MR. FALGOWSKI:**  Our investigation shows that someone, an employee said
> that in about May of 2022, that Mr. Higgins gave them $25,000 as a gift[.]

Transcript, attached as Exhibit A, page 23.

The Defendant responded to the prosecutor's reference to the employee's cash gift,

demonstrating that he knew the exact identity of the employee, who obviously had

interviewed with investigators.

> **THE DEFENDANT**:  In direct comment to the $25,000, that was a loan to be
> repaid when she re-mortgaged her house back to the company.  She had just gotten
> separated from who she had been living with for some time, had a lot of overhead,
> credit card debt, this and that, and I said fine.  She said there is just no way I can
> redo my mortgage on the house with all of this, so the company loaned her $25,000
> with the idea that after two or three months she would then apply to re-mortgage,
> get a new mortgage and pay the $25,000 back.  And then, of course, all of this
> happened.
> **THE COURT**: Did she pay the loan back?
> **THE DEFENDANT**:  She has not.

Transcript, attached as Exhibit A, page 27.

23.     After the hearing, on April 26, 2023 Higgins re-submitted his financial affidavit to

the court. The affidavit claimed Higgins owned a home worth approximately $960,000 but did not

list any other property. Higgins also claimed he was unemployed and received $2,528 per month in social security.

### *Subsequent Attempted Witness Intimidation*

24.     After the April 20 hearing, during which the government alerted Judge Noreika to the fact that a government witness had informed the government of the $25,000 gift, another witness (hereinafter Witness 2) alerted your affiant that in early-to-mid May, 2023, the Defendant posted a message on Witness 1's Facebook.com profile.  That message stated "SILENCE is GOLDen."  By the time that Witness 2 tried to log back into Facebook.com to take a "screenshot" of the posting by the Defendant, it had been deleted.  Upon my information and belief, and based on my training and experience as a law enforcement officer and federal agent, this statement is a reference to the fact that Witness 1 spoke to law enforcement about the Defendant instead of remaining silent.

25.     After law enforcement contacted the attorney for Witness 1 to determine whether or not Witness 1 had seen the post on her Facebook.com page with the reference to "SILENCE is GOLDen," Witness 1 sent law enforcement a text message she had received from the Defendant just after midnight on May 15, 2023.  The message stated:  "I found out tonight that [Witness 3] was working with the government.  I am not concerned[,] but he has said anything/everything[,] truth or not truth[.]  Thinking he has to save himself[.] He is my Judas[.]"  Upon my information and belief, and based on my training and experience as a law enforcement officer and federal agent, this statement to Witness 1 was a warning not to speak to the government any longer because by this point in time, the Defendant had been aware that Witness 1 had also spoken to the government. Nevertheless, the Defendant still contacted Witness 1 and told her that he considered Witness 3,

10

whom he believed had also spoken with the government had therefore betrayed him:  "He is my Judas."  I therefore submit that this was a calculated message from the Defendant meant to influence Witness 1 to stop providing information to the government and to cause and induce her to withhold further information.

### *Evidence of Knowingly False Statements Made at the April 20th Hearing*

26.     These statements were false. As evidenced below, the statements based by the Defendant at the April 20 hearing relating to access to a car, paying for trips, and the access to precious metals were all knowingly false.

#### *Receiver's seizure of gold coins from Higgins' residence*

27.     On June 9, 2023, your affiant spoke with Kelly Crawford ("Crawford"), the appointed Receiver, who advised that he led a search that same day at Higgins' residence, located on Applegate Drive, West Chester, PA, pursuant to an order issued by the Honorable Richard Andrews, United States District Judge.   The search team was equipped with metal detectors. Crawford's team recovered gold coins weighing a combined estimated 35 to 36 ounces and valued by Crawford at approximately $72,000.  As of June 9, 2023, the spot price of an ounce of gold was $1,968.  The gold coins were found in the ceiling above a closet in a downstairs bedroom adjacent to Higgins' office.   When Crawford searched the bedroom closet, there was nothing in the closet except for a step ladder, which could be used to access the gold pieces hidden in the ceiling. As stated above, the coins appear to be ½ oz. American Gold Eagle coins and 1 oz. American Gold Buffalo coins.

#### *Evidence of Other Possession of Precious Metals*

28.     On June 7, 2023, your affiant learned from a former employee of the Defendant's that the Defendant continued to engage in selling metals to a dealer located on the West Coast after the Receiver seized the Defendant's businesses in October of 2022.  Your affiant located four .pdf files on the Defendant's phone that are invoices issued from Higgins to a metals dealer located in California.  Each invoice is marked as having been paid and the balance due equal to zero.   An example of one invoice is below:



29.     Amounts billed and items sold per the invoices are summarized below:

| Invoice Date | Description | Quantity | Price | Total |
|---|---|---|---|---|
| 10/28/2022 | AGE1* | 6 | $1,842 | $11,052 |

| 11/02/2022 | CML1* | 5 | $1,731 | $8,670 (includes $15 for shipping) |
| 02/24/2023 | 1 Oz Silver Buffalo Rounds | 1000 | $22.00 | $22,000 |
| 02/25/2023 | AGE1 Oz | 4 | $1,877 | $7,508 |

Notes:  *Your affiant is familiar with AGE as an abbreviation for an American Gold Eagle coin and CML as an abbreviation for Canadian Maple Leaf gold coins.

30.     Your affiant also found a record of a text message exchange showing that this metals dealer sent a 1.4 pound package on March 3, 2023 directly to the home of the Defendant. In a message including a picture of the tracking number, the sender wrote to the Defendant "It will be there by 8:30am … I should have sent the $22k out earlier today I would have made that cut off time."  Your affiant submits that there is probable cause to believe that that these invoices and messages show that in and around March 2023, just before the April 20th hearing in front of Judge Noreika, the Defendant sold over almost $30,000 worth of metal to this dealer and was sent at least $22,000 in cash through the mail directly to his home.

### *Purchase of a Hummer H2 by the Defendant in advance of the April 20th Hearing*

31.     On April 14, 2023, just six days before Higgins testified before Judge Noreika, your affiant drove by Higgins' home on Applegate Drive in West Chester, Pennsylvania and observed Higgins  in his driveway vacuuming a Hummer H2 with a specific PA tag number.  Your affiant soon traced, through motor vehicle title records, that tag number to the March 3, 2023 sale of the

Hummer H2 by a Troy, New York resident ("the seller") to Higgins' wife.  See Exhibit B, pp. 1-2. [4]

32.     On April 26, 2023, your affiant spoke by phone with the seller, who confirmed that she was the prior owner of the Hummer H2.  She said that her Hummer was listed for sale online and that Robert Higgins responded to the advertisement.  Ultimately, the seller's boyfriend negotiated the sale of the Hummer with Higgins.

33.     Your affiant contacted the seller's boyfriend by telephone.  He confirmed that through a combination of telephone and text messages, he negotiated a $17,500 sale price of the Hummer with Higgins.  He also stated that Higgins offered to pay for the Hummer H2 with a combination of gold and cash.  *See* Exhibit C.

34.     The seller's boyfriend forwarded to your affiant text messages, dated February 24 and 25, 2023, received from Higgins.  In those text messages, Higgins offered to make "the 10 hour round trip drive" and asked, "What's your thought being paid in gold?"  *See* Exhibit D. Higgins listed, "#1  1/2 Oz American Gold Eagles $953   #2  1 Oz Credit Susie Gold Bar $1842 #3  1 Oz American Gold Buffalo $1875  #4.  1 Oz American Gold Eagle $1,877"  and texted photos of two gold coins and a Credit Suisse 1 Oz gold bar.  *See* Exhibit E.  Higgins further stated, "…what ever the difference I will add cash to the balance[.]"  *See* Exhibit F.  It should be noted that among the items found by Crawford during a search of the Defendant's home were what

---

[4] Exhibits B-F are filed under seal herewith because they contain personal identifying information.

appeared to be ½ oz. American Gold Eagles and 1 oz. American Gold Buffaloes, matching the coins that the Defendant offered in part to pay for the Hummer.

35.     Your affiant further was told by the seller's boyfriend that he declined to accept gold from Higgins when he came to New York on March 3, 2023 to make the purchase, instead wanting to be paid in cash.  The seller's boyfriend stated that Higgins said the sale should be done in gold because gold was untraceable.  Finally, the seller stated that Higgins showed him multiple gold bars and coins.  However, because the seller's boyfriend declined to accept payment in gold, Higgins later returned with $11,500 in cash, agreeing to pay for the balance later.  *See* Exhibit C.

36.     Finally, on May 19, 2023, Higgins was surveilled by federal agents driving this Hummer from his home to the Federal Courthouse in Wilmington for another hearing in front of Judge Noreika.

### *Expenditures in Hawaii*

37.     Since the time of the April 20 hearing, your affiant and other law enforcement have obtained evidence that directly contradicts the statements made by the Defendant about his December 2022 trip to Hawaii.  Specifically, your affiant has reviewed evidence that on December 26, 2022, the Defendant's wife paid, by credit card, $9,598.49 in maintenance fees for "Week 50" and "Week 51" to Hyatt Vacation Management for the Hyatt Residence Club in Maui, Hawaii. These dates match the Defendant's aforementioned trip to Hawaii exactly, which occurred between December 17 and December 31, 2022.  This evidence directly contradicts an express statement by

the Defendant to Judge Noreika that he has "not pay a cent" for his time share in Hawaii.  Exhibit A, p. 24.[5]

38.     Based on records previously reviewed by your affiant from Maui Timeshare Venture, LLC., a developer entity of one of the resorts that is part of the Hyatt Residence Club in Hawaii, your affiant is aware that the Defendant purchased a time share for Week 50 on December 15, 2015 and Week 51 on December 17, 2014 at a Hyatt resort located in Lahaina, HI.

***CFTC Investigation***

39.     On or about September 27, 2022, the Commodity and Futures Trading Commission ("CFTC") filed an Ex Parte Motion for Statutory Restraining Order, Appointment of Temporary Receiver and Other Equitable Relief against FSD, Argent, and Higgins in The United States District Court for the District of Delaware.

40.     The Motion alleged that "from at least January 2014 through the present FSD, Argent, and Higgins engaged in a fraudulent and deceptive scheme in connection with the purchase and sale of precious metals… In carrying out the Scheme, Defendants: (a) misappropriated Customer funds and assets;(b) led Customers to believe that their assets were held at FSD, when in fact they were not; (c) led Customers to believe that Defendants had obtained silver for Customers, when in fact they had not; (d) misappropriated funds and assets belonging to certain

---

[5] The Defendant's wife's credit card records also show an additional $1,302 spent at a jewelry store in Hawaii on December 22, $874 spent at a Steakhouse on December 25, and $1,323 on airfare to Hawaii.

Clients, and deceived those Clients when they asked FSD to return their assets; and (e) deceived

Customers and Clients regarding the insurance coverage that FSD maintained for both Customers

and Client assets, including by leading Customers and Clients to believe their assets were fully

insured for 100% of their value, when in fact they were not.

41.     On September 29, 2022 the Honorable Richard G. Andrews granted the motion for

an Ex Parte Statutory Restraining Order, Appointment of a Temporary Receiver, and Other

Equitable Relief (the "SRO").

42.     The SRO ordered in part:

    a.  The Defendants are restrained and enjoined from directly or indirectly
        withdrawing, transferring, removing, dissipating or otherwise disposing of any
        assets. The Defendants and any other person who has possession, custody, or
        control of any of Defendants' funds, assets or property shall transfer possession of
        all assets subject to this order to the Temporary Receiver.
    b.  The SRO appointed Kelly Crawford as temporary receiver with the full powers of
        an equity receiver for Defendants and affiliates and subsidiaries owned or
        controlled by Defendants and all of the funds, properties, premises, accounts,
        income, now or hereafter due or owing to the Defendants, and other assets directly
        or indirectly owned beneficially or otherwise, by the Defendants.
    c.   The Defendants and any other person served with the SRO shall… deliver to the
        temporary receiver: possession and custody of all assets of the Defendants,
        wherever situated, including those owned beneficially or otherwise.

43.     On December 12, 2022 the Honorable Judge Andrews issued an Order of

Preliminary Injunction, Appointment of a Receiver and for other Equitable Relief Against

Defendants. This order in part stated, "Defendants… shall be restrained, enjoined and prohibited

from directly or indirectly using or employing or attempting to use or employ, in connection with

any swap or contract of sale of any commodity in interstate commerce…"

44.     On December 30, 2022 a default judgment was entered against defendants FSD,

Argent, and Higgins.

45.     On January 9, 2023 and January 23, 2023 the Receiver submitted a report to the Court prepared by the accounting firm Baker Tilly. Baker Tilly was hired by the Receiver to conduct an audit of the physical metals and other assets at 100 Todds Lane, Wilmington, DE which was the headquarters for FSD and Argent. A summary of the Accountant's findings included:

   a. FSD had 2,102 customer accounts and 1,065 of those accounts had no discrepancies between what was shown on the inventory and what was found physically present. There were discrepancies, however, with 1,013 accounts having less inventory present than shown on the inventory report and 18 accounts having more inventory present than shown on the inventory report. There were also 6 accounts related to Argent, Higgins, and CAMI.
   b. The estimated value of the assets missing from the FSD customer accounts ranged from $58.9 million to $112.7 million.

### *Higgins' Bankruptcy Filing*

46.     On August 2, 2022 Higgins entered a Voluntary Petition for Individuals Filing for Bankruptcy. Higgins previously filed for bankruptcy earlier in 2022 as well as in 2016.

47.     According to Schedule A/B Property filed on August 15, 2022, Higgins assets consisted of $900,407 of real estate and $10,745 of personal property. Under the section entitled Jewelry, Higgins listed only a watch and wedding ring with a value of $200. Higgins did not disclose any gold or silver which were both included as examples in the Jewelry category.

48.     According to Schedule I: Your Income, Higgins noted receiving $2,308 in social security and $1,548 in social security payments for his daughter. Higgins' spouse earned $6,000 per month as an Office Assistant at Argent.

## CONCLUSION

49.     I submit that this affidavit supports that there is probable cause that the Defendant

Robert L. Higgins committed the offenses identified in this criminal complaint.

Respectfully submitted,

*Antonio Lo Piccolo*
Special Agent Antonino Lo Piccolo
IRS Criminal Investigation

Subscribed and sworn to telephonically in accordance with Fed. R. Crim. P. 4.1 before me on June 10, 2023:

THE HONORABLE SHERRY R. FALLON
UNITED STATES MAGISTRATE JUDGE

19

# EXHIBIT A

13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,  )
                           ) Criminal Action
v.                         ) No. 22-cr-0044(MN)
                           )
ROBERT L. HIGGINS,         )
                           )
          Defendant.       )

                    Thursday, April 20, 2023
                    2:00 p.m.
                    Hearing

                    844 King Street
                    Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

            UNITED STATES ATTORNEY'S OFFICE
            BY:  EDMOND FALGOWSKI, ESQ.
            BY:  ALEXANDER IBRAHIM, ESQ.

                    Counsel for the United States

            WILKS LAW, LLC
            BY:  ANDREA S. BROOKS, ESQ.
            BY:  ANNA FISCELLA, ESQ.

                    Counsel for the Defendant

1

– – – – – – – – – –

13:45:02 2

13:58:25 3          THE COURT:   All right.  Good afternoon,

14:13:39 4   everyone.  Please be seated.

14:13:41 5          MR. FALGOWSKI:  Good afternoon, Your Honor.

14:13:42 6   Edmond Falgowski for the United States.  This is a hearing

14:13:46 7   that the Court ordered in the United States v. Robert

14:13:50 8   Higgins, Criminal Action No. 22-44-MN.  Present at my table

14:13:56 9   is my co-counsel, Alex Ibrahim.  The Defendant is present

14:14:02 10  together with his attorney, Andrea Brooks, and an associate,

14:14:11 11  Anna Fiscella.

14:14:11 12         THE COURT:  Ms. Brooks, you have not been

14:14:13 13  appointed as Mr. Higgins' attorney, so how are we going to

14:14:17 14  handle this?

14:14:18 15         MS. BROOKS:  I apologize, Your Honor.  I thought

14:14:20 16  that Mr. Wilks and I both were appointed.  But I can handle

14:14:24 17  it for Mr. Wilks with the Court's permission, Your Honor.

14:14:28 18         THE COURT:  All right.

14:14:29 19         MS. BROOKS:  I handled the bail hearings as

14:14:32 20  well, that was my understanding that I was entered.

14:14:35 21         THE COURT:  You handled his bail hearings not as

14:14:41 22  appointed CJA counsel, he was your client, so that was fine,

14:14:47 23  he had retained the firm.  My order appointed Mr. Wilks.

14:14:52 24         MS. BROOKS:  Okay.  I apologize, Your Honor.  I

14:14:57 25  have been working closely with Mr. Wilks on this case

14:14:58  1    handling the budget and the communications, Anna Fiscella

14:15:03  2    and I both have with Renee Edelman.  With the Court's

14:15:07  3    indulgence --

14:15:09  4              THE COURT:  We will do that today.  I have not

14:15:11  5    entered any order or approved that budget.  This allowing

14:15:14  6    you to substitute in I think just for efficiency purposes

14:15:19  7    doesn't have implications on that.

14:15:21  8              MS. BROOKS:  I apologize, Your Honor.  This is

14:15:23  9    my first CJA anything in my life, so I do apologize, Your

14:15:27 10    Honor.

14:15:27 11              THE COURT:  Thank you all for being here.  I

14:15:29 12    scheduled this because I have some further questions about

14:15:32 13    Mr. Higgins' financial eligibility for the CJA funds.  I

14:15:36 14    just want to give a short recap.  Mr. Higgins was indicted

14:15:39 15    in May of 2022 on counts related to tax evasion.  A

14:15:46 16    superseding indictment was filed a month later.  Mr. Higgins

14:15:48 17    is pleading not guilty and currently released on conditions.

14:15:51 18    Mr. Higgins initially retained the Wilks law firm to

14:15:55 19    represent him.

14:15:55 20              In February of this year, Mr. Higgins submitted

14:15:58 21    a completed financial affidavit and asked for Mr. Wilks to

14:16:02 22    be appointed as CJA counsel.  I do not see a lot of

14:16:06 23    financial affidavits asking for appointment of counsel, much

14:16:11 24    less those choosing who the appointed counsel should be.

14:16:14 25    That is usually done at the magistrate judge level, but here

because Mr. Higgins had already retained counsel, it came to me.

On February 7th of this year I issued an order appointing David E. Wilks, Esq. as attorney for Mr. Higgins until further order of the Court.  Soon thereafter, an attorney at Mr. Wilks' firm, Ms. Brooks, requested a waiver of the case compensation amounts and appointment of two additional counsel at the Wilks Law Firm.  There was no cap on the amount requested and the Court requested a budget.

The budget submitted seeks more than $230,000 of CJA funds through, but not including, trial and includes not two additional counsel, but three additional counsel and a paralegal.  I have not yet approved that request.  And in considering the request, I went back and reviewed Mr. Higgins' financial affidavit as well as the docket in this case and certain documents submitted in connection with the civil case that is pending against Mr. Higgins that addressed issues about a retainer and payment of fees.  Of note, Mr. Higgins list a $900,000 asset in his house, and additional assets of more than $10,000 in personal property. And I note that although his affidavit states that he has no income since 2012, other documents indicate regular family trips to Cosa Rica and Belarus since that time.  All this is giving me pause about the extent of Mr. Higgins' financial situation and whether he is financially eligible for

14:17:48 1    appointment of counsel and even if so, whether given his

14:17:51 2    resources he should be required to contribute to some extent

14:17:54 3    to his defense rather than leave it all on the public.

14:18:01 4         I have an obligation to ensure that limited CJA

14:18:06 5    funds are used properly and not used if the defendant is not

14:18:09 6    financially eligible.  So what I propose to do is exercise

14:18:13 7    my right to review the request for appointment of counsel

14:18:16 8    and to do that by placing Mr. Higgins under oath and asking

14:18:20 9    some questions about his financial situation.

14:18:23 10        I do not intend to ask Mr. Higgins anything that

14:18:27 11   would implicate the Fifth Amendment, but certainly if I were

14:18:30 12   to do so, you are free to object.

14:18:33 13        All right.  So that's my proposal.  That's why

14:18:36 14   we're here today.  Any questions, concerns, objections?

14:18:42 15        MR. FALGOWSKI:  No, Your Honor.

14:18:43 16        MS. BROOKS:  None from me, Your Honor.

14:18:45 17        THE COURT:  Mr. Buckson, will you please place

14:18:47 18   Mr. Higgins under oath.

14:18:48 19        MS. BROOKS:  Your Honor, would you like him to

14:18:50 20   walk up to the witness stand?

14:18:51 21        THE COURT:  If you're comfortable there, sir,

14:18:52 22   you can stay there.

14:18:54 23        COURT CLERK:  Please rise.  Please raise your

14:18:58 24   right hand and state and spell your full name for the

14:19:00 25   record.

14:19:01 1          THE DEFENDANT:  Robert L. Higgins.  R-O-B-E-R-T,

14:19:05 2   L, H-I-G-G-I-N-S.

14:19:08 3          ROBERT L. HIGGINS, having been duly sworn, was

14:19:09 4   examined and testified as follows:

14:19:14 5          THE COURT:  All right.  Thank you.  And we just

14:19:17 6   need a minute.  I need someone to bring me my glasses.

14:19:24 7          Sir, do you have your financial affidavit, a

14:19:28 8   copy of that?

14:19:31 9          THE DEFENDANT:  Yes, I have it in front of me.

14:19:37 10          THE COURT:  All right.  Thank you.

14:19:42 11          All right.  Sir, I just want to walk through

14:19:46 12   some of these things and then ask you some additional

14:19:49 13   questions.  Okay?

14:19:50 14          THE DEFENDANT:  Yes.

14:19:50 15          THE COURT:  It says here in your financial

14:19:53 16   affidavit that you have not worked since December of 2012;

14:19:57 17   is that correct?

14:19:57 18          THE DEFENDANT:  That is correct.

14:19:58 19          THE COURT:  And your spouse is not employed?

14:20:02 20          THE DEFENDANT:  She was employed I think it was

14:20:07 21   2014 to 20 -- well, up until the point and time that it was

14:20:12 22   closed down.

14:20:13 23          THE COURT:  Okay.

14:20:15 24          THE DEFENDANT:  So she worked for the company.

14:20:17 25          THE COURT:  Do you know about when the company

14:20:19 1    was closed down?

14:20:21 2              THE DEFENDANT:  I believe it was October 5th of

14:20:26 3    '22.

14:20:28 4              THE COURT:  Okay.  And you did not continue to

14:20:31 5    work for the company?

14:20:32 6              THE DEFENDANT:  Well, I was there as far as

14:20:39 7    trading and this and that, but I didn't actually draw a

14:20:42 8    salary.

14:20:43 9              THE COURT:  Did you get any financial benefit

14:20:46 10   from the company up until the time --

14:20:50 11             THE DEFENDANT:  I did not.

14:20:50 12             THE COURT:  It ask in the affidavit have you

14:20:53 13   received within the past twelve months any income from a

14:20:57 14   business, profession, a whole bunch of other things, or

14:21:01 15   other sources, and you said no.  Do you receive Social

14:21:07 16   Security payments?

14:21:08 17             THE DEFENDANT:  I do.

14:21:08 18             THE COURT:  Is that not included as income?

14:21:15 19             THE DEFENDANT:  I -- I don't know how that is

14:21:20 20   considered.  This form that we presented as a financial

14:21:22 21   affidavit was for a Chapter 13 filing, so I kind of assumed

14:21:28 22   that whatever it considered -- I think it does actually --

14:21:34 23             THE COURT:  Let me ask you this, did you not

14:21:36 24   fill this out particularly for the issue that is before me,

14:21:41 25   that is your financial eligibility to have counsel

14:21:46 1    appointed?

14:21:46 2                THE DEFENDANT:  I believe it does represent

14:21:48 3    exactly that.

14:21:49 4                THE COURT:  And when did you fill it out?

14:21:51 5                THE DEFENDANT:  At the time that it was

14:21:52 6    presented to me to present it.

14:21:55 7                THE COURT:  When was that?

14:21:56 8                THE DEFENDANT:  I can't honestly remember what

14:21:59 9    the time frame was.  See if there is a date on this.  I

14:22:19 10   don't see a date that's actually marked when this was

14:22:23 11   actually given for filing.

14:22:27 12               THE COURT:  Do you recall when you did it?

14:22:29 13               THE DEFENDANT:  I -- honestly it's not something

14:22:34 14   that I have in memory.

14:22:36 15               THE COURT:  It was submitted to me just about a

14:22:38 16   month ago.  Is that when you did it or did you do it long

14:22:41 17   before that?

14:22:42 18               You said something about a Chapter 13

14:22:44 19   bankruptcy.  I don't know what --

14:22:47 20               THE DEFENDANT:  I believe that I filled this out

14:22:51 21   not just a month ago, maybe like two or three months --

14:22:54 22   maybe end of the year or something.

14:22:57 23               THE COURT:  All right.  So how much do you

14:23:01 24   receive monthly in Social Security payments?

14:23:05 25               THE DEFENDANT:  I receive 2,500 and change on a

14:23:11 1    monthly basis.

14:23:14 2              THE COURT:  All right.  You have listed your

14:23:16 3    house, the value given at about $900,000.  When did you buy

14:23:23 4    that house?

14:23:24 5              THE DEFENDANT:  I actually listed a house that

14:23:26 6    is jointly owned by my wife and myself.

14:23:30 7              THE COURT:  Okay.  When did you buy the house?

14:23:32 8              THE DEFENDANT:  I bought the house in 1999.

14:23:35 9              THE COURT:  How much did you buy it for?

14:23:37 10             THE DEFENDANT:  386,000.

14:23:39 11             THE COURT:  Where did you get the funds for

14:23:41 12   that?

14:23:42 13             THE DEFENDANT:  Mortgage.  Wells Fargo.

14:23:47 14             THE COURT:  Do you have equity in that house?

14:23:50 15             THE DEFENDANT:  I am fifty percent owner of the

14:23:53 16   house.  There is no mortgage currently.

14:23:55 17             THE COURT:  So you are fifty percent owner of a

14:23:58 18   $900,000 asset that is free and clear?

14:24:03 19             THE DEFENDANT:  It is free and clear as far as a

14:24:06 20   mortgage.  There is an ongoing situation going on now where

14:24:11 21   my one attorney says we owe 300,000 and the other attorney

14:24:24 22   says -- representing the other clients say we owe 700,000.

14:24:30 23             THE COURT:  What does that mean, owe?  You mean

14:24:33 24   owe the attorneys?

14:24:35 25             THE DEFENDANT:  They have a, what do you want to

14:24:38 1    call it, a judgment against me --

14:24:41 2              THE COURT:  They have a lien against you?

14:24:43 3              THE DEFENDANT:  And they have a judgment against

14:24:46 4    the house.

14:24:54 5              THE COURT:  And what attorneys are those?  Are

14:24:56 6    those your current attorneys or different attorneys?

14:24:59 7              THE DEFENDANT:  They are Robert Lohr out of West

14:25:05 8    Chester, Pennsylvania is my attorney, and the other attorney

14:25:07 9    is out of California, I believe it's Gotlieb, G-O-T-L-I-E-B,

14:25:19 10   maybe.

14:25:20 11             THE COURT:  So are you able to sell your house

14:25:22 12   or take any of the equity in the house out of it?

14:25:27 13             THE DEFENDANT:  Not at this time.

14:25:30 14             THE COURT:  And when did that judgment or lien,

14:25:33 15   when was that put on your house?

14:25:35 16             THE DEFENDANT:  That was, oh, my gosh, 2012, I

14:25:43 17   believe.

14:25:48 18             THE COURT:  All right.  Do you own a car?

14:25:50 19             THE DEFENDANT:  I do not.

14:25:51 20             THE COURT:  Do you drive?

14:25:52 21             THE DEFENDANT:  Up until a few days ago I did

14:25:55 22   not have a driver's license.  So I now have the capacity to

14:26:01 23   drive, but the vehicle that I drove is the H2 that the CFTC

14:26:11 24   basically took possession of.

14:26:14 25             THE COURT:  All right.  So if you drive now, if

14:26:16 1    you were to drive now, what car would you drive?

14:26:19 2              THE DEFENDANT:  That's what I'm working on, I

14:26:21 3    need to get a car.

14:26:22 4              THE COURT:  You don't have a car that's

14:26:24 5    available to you?

14:26:24 6              THE DEFENDANT:  Right.

14:26:25 7              THE COURT:  Bank accounts, you list about $5,000

14:26:27 8    in bank accounts.  Is that a reasonable current estimate?

14:26:31 9              THE DEFENDANT:  That's probably less than that

14:26:32 10   at this point.

14:26:33 11             THE COURT:  All right.  Is that a joint account?

14:26:35 12             THE DEFENDANT:  It is.

14:26:36 13             THE COURT:  Do you have any other individual or

14:26:39 14   joint accounts?

14:26:40 15             THE DEFENDANT:  No stocks, no bonds, no other

14:26:44 16   accounts, just one what we call a family operating account.

14:26:48 17             THE COURT:  All right.  And does your wife have

14:26:51 18   individual, an individual bank account?

14:26:55 19             THE DEFENDANT:  She operates the family account.

14:26:58 20   My Social Security goes into my individual account, and then

14:27:02 21   I transfer the funds over to her account to help pay the

14:27:02 22   bills.

14:27:02 23             THE COURT:  So you have an individual account at

14:27:02 24   what bank?

14:27:02 25             THE DEFENDANT:  At M & T.

14:27:12 1          THE COURT:  Okay.  And then that bank is not

14:27:14 2     listed on this financial disclosure, is it?

14:27:17 3          THE DEFENDANT:  I didn't have M & T Bank until

14:27:21 4     probably maybe two months ago.  I had to open up a new

14:27:26 5     account according to the CFTC to allow my Social Security to

14:27:31 6     individually come into that account.

14:27:33 7          THE COURT:  So counsel, you submitted a

14:27:35 8     financial affidavit to me that does not seem to be current

14:27:38 9     as of the time that you submitted it.  So what's going on

14:27:40 10    here?

14:27:42 11         MS. BROOKS:  So, Your Honor, when we first sent

14:27:43 12    a letter in February, it was current.

14:27:46 13         THE DEFENDANT:  Yes.

14:27:46 14         MS. BROOKS:  The CFTC matter, I think all of

14:27:50 15    that has happened months after the CFTC froze the bank

14:27:55 16    account.  When I first submitted it, I haven't updated it

14:27:58 17    since the first letter, Your Honor, and I apologize, but it

14:28:01 18    was my understanding that nothing major had happened since

14:28:04 19    then.  I know that the Social Security account had to be

14:28:07 20    reopened and we worked with the receiver to do that because

14:28:11 21    of the freeze that happened with the CFTC litigation.  Once

14:28:13 22    everything was frozen, he didn't have an account for any

14:28:15 23    monies to come in because the CFTC had control of all that.

14:28:22 24    We instructed him to work with the government and the

14:28:25 25    receiver to open a new bank account for him.  That is a new

14:28:30 1    update.   Everything else should be the same, but it was only

14:28:33 2    a result of all of us working together to figure out how the

14:28:36 3    Social Security would be deposited.

14:28:39 4                THE COURT:  Do you have any understanding as to

14:28:40 5    why Social Security wasn't disclosed on this?

14:28:43 6                MS. BROOKS:  I do not, Your Honor, no.

14:28:46 7                THE COURT:  All right.

14:28:52 8                MS. BROOKS:  Sorry, Your Honor, Ms. Fiscella

14:28:56 9    worked on this heavily.   She thought it was listed on the

14:29:00 10   back.

14:29:00 11               MS. FISCELLA:  My apologies, Your Honor.   I do

14:29:03 12   recall submitting to the Court an attachment.

14:29:10 13               MS. BROOKS:  Here it is.

14:29:11 14               MS. FISCELLA:  It's side one, Social Security

14:29:14 15   earnings.

14:29:15 16               MS. BROOKS:  I can pass it up to Your Honor.

14:29:17 17               THE COURT:  Yes, I don't have that attached.

14:29:19 18               MS. BROOKS:  May I approach?

14:29:21 19               THE COURT:  Yes.

14:29:41 20               What does that mean, he just said he gets $2,100

14:29:42 21   a month?   This has not -- I mean, what is this -- this

14:29:48 22   doesn't disclose any income, does it?

14:29:52 23               THE DEFENDANT:  I believe that there is, you

14:29:54 24   know, it starts showing income from the time that it started

14:29:57 25   coming to me.   So where you see blanks, I wasn't receiving

14:30:04 1    social -- that's an official printout.

14:30:07 2              THE COURT:  When did you start receiving Social

14:30:09 3    Security?

14:30:10 4              THE DEFENDANT:  It's there on the paper, the

14:30:13 5    very first time that it shows any money coming to --

14:30:18 6              THE COURT:  There is a number in 2012, and there

14:30:20 7    is 0, 0, 0, 0, 0, 0 from 2013 to 2020, and then not year

14:30:29 8    recorded for 2021 and 2022.  So did you receive Social

14:30:33 9    Security in 2020?

14:30:35 10             THE DEFENDANT:  Yes, I did.

14:30:36 11             THE COURT:  So then I don't understand what this

14:30:38 12   document is that you're giving me.

14:30:41 13             THE DEFENDANT:  There is nothing on the reverse

14:30:43 14   side.  There is a double print.  There should have been a

14:30:47 15   second page to it.  That would have actually gone all the

14:30:51 16   way to that.  I can go online and print another one out.

14:30:55 17             THE COURT:  The problem I have is you're seeking

14:30:57 18   to show me that you're financially eligible for this, and I

14:31:05 19   don't have current information and I don't have accurate

14:31:07 20   information.  So it's concerning to me.

14:31:08 21             THE DEFENDANT:  Well, that is available on the

14:31:12 22   website --

14:31:12 23             THE COURT:  Yes, but it's not my job to do this.

14:31:16 24             THE DEFENDANT:  No, I'm not indicating that,

14:31:18 25   Your Honor.  I felt that I had -- I did a printout of 2022,

14:31:22 1   so it should have showed that.

14:31:37 2           THE COURT:  All right.  Have you transferred any

14:31:39 3   money to any accounts belonging to your wife or your child?

14:31:43 4           THE DEFENDANT:  I do not.

14:31:46 5           THE COURT:  Travel.  I have seen some

14:31:50 6   information about you taking an annual trip to Belarus, you

14:31:55 7   have done that since 2012, correct?

14:31:57 8           THE DEFENDANT:  We have done that -- no -- well,

14:31:59 9   yes, from 2012 up to whenever COVID started.  We have not

14:32:06 10  been able to go there since then because of the restrictions

14:32:09 11  on that area.  And my wife's sister used to always come to

14:32:16 12  us part of the time and she's not been able to get a Visa.

14:32:20 13          THE COURT:  Where did you get the funds for the

14:32:22 14  trip to Belarus.

14:32:23 15          THE DEFENDANT:  The trips to Belarus, we used

14:32:26 16  miles that we received with American Airlines.  And, of

14:32:33 17  course, they stay with their mom and sister and everyone

14:32:36 18  over there so there is no hotels or anything like that.

14:32:39 19          THE COURT:  You received miles from American

14:32:41 20  Airlines, those were miles that you got from taking other

14:32:44 21  trips?

14:32:44 22          THE DEFENDANT:  Those are miles that we get from

14:32:47 23  running the business, traveling to trade shows around the

14:32:51 24  country.  I have done that since I was nineteen, so,

14:33:01 25  forty-eight years, forty-five.

14:33:02  1              THE COURT:  Costa Rica, did you go to Costa Rica

14:33:06  2    last June?

14:33:06  3              THE DEFENDANT:  Last June we did.

14:33:08  4              THE COURT:  For nine days?

14:33:09  5              THE DEFENDANT:  Yes.

14:33:10  6              THE COURT:  Where did you get the funds for

14:33:12  7    that?

14:33:12  8              THE DEFENDANT:  The Hyatt points from the Hyatt

14:33:14  9    hotels paid for the rooms and again, American Airlines,

14:33:18 10    mileage points.

14:33:19 11              THE COURT:  You still have Hyatt points and

14:33:21 12    mileage points available to you?

14:33:23 13              THE DEFENDANT:  Very little at the moment.  It's

14:33:25 14    basically because I haven't been traveling and I haven't

14:33:28 15    been staying in hotels and stuff, so it's kind of all been

14:33:32 16    used up.

14:33:34 17              THE COURT:  And the Costa Rica trip, that was

14:33:38 18    something else that you and the family did somewhat

14:33:41 19    regularly?

14:33:42 20              THE DEFENDANT:  During spring break for maybe

14:33:45 21    like three years we started.

14:33:47 22              THE COURT:  Other than Costa Rica, have you

14:33:50 23    taken any vacations in the last twelve months?

14:33:52 24              THE DEFENDANT:  In the last twelve months we

14:33:55 25    were in Maui, again with Hyatt points staying at a Hyatt

14:34:02 1    hotel.

14:34:02 2              THE COURT:  When did you go to Maui?

14:34:05 3              THE DEFENDANT:  December 15th.  And again,

14:34:12 4    that's the last -- all of that was already prearranged like

14:34:17 5    a year before.  And at this point in time, that's all

14:34:21 6    dissipated.

14:34:22 7              THE COURT:  How long were you in Maui?

14:34:26 8              THE DEFENDANT:  In Maui, we go there for

14:34:29 9    fourteen days.

14:34:32 10             THE COURT:  How often do you go out to dinner?

14:34:36 11             THE DEFENDANT:  Normally once on a weekend.  My

14:34:38 12   wife is a great cook.  We eat at home a lot.

14:34:41 13             THE COURT:  Where do you get the funds to go out

14:34:44 14   to dinner?

14:34:45 15             THE DEFENDANT:  It's a choice of whether we eat

14:34:49 16   at home or eat there.  It's really -- my wife is not a big

14:34:54 17   eater, I'm not a big eater, so it's probably about 75 to 100

14:35:01 18   bucks.

14:35:01 19             THE COURT:  Your daughter, is she in high

14:35:04 20   school?

14:35:04 21             THE DEFENDANT:  First year of high school.

14:35:06 22             THE COURT:  Does she go to public school?

14:35:08 23             THE DEFENDANT:  Yes, she does.

14:35:09 24             THE COURT:  Do you have any gold, silver, or

14:35:11 25   other precious metals that you own or that is available to

14:35:15 1    you in any way?

14:35:16 2                    THE DEFENDANT:  I do not.

14:35:16 3                    THE COURT:  Any Crypto currency?

14:35:19 4                    THE DEFENDANT:  I never believed in it.

14:35:21 5                    THE COURT:  Have you given any gifts to anyone

14:35:24 6    including a family member in the last twelve months?

14:35:26 7                    THE DEFENDANT:  I guess that depends on the

14:35:28 8    definition of gifts.

14:35:30 9                    THE COURT:  Think of it broadly.

14:35:33 10                   THE DEFENDANT:  You know, birthday, you know, 20

14:35:37 11   bucks to there, I got nine grandchildren, something to

14:35:43 12   recognize the moment.

14:35:45 13                   THE COURT:  How many children do you have?

14:35:47 14                   THE DEFENDANT:  I have one with my current wife

14:35:50 15   and five with my first wife.

14:35:53 16                   THE COURT:  Okay.  So other than the birthday

14:36:01 17   presents to your grandchildren, any other gifts you have

14:36:07 18   given?

14:36:07 19                   THE DEFENDANT:  No.

14:36:07 20                   THE COURT:  Wife, current child, any gifts?

14:36:10 21                   THE DEFENDANT:  No.  Actually the European or

14:36:14 22   Belarusian type thing or whatever, they don't even like

14:36:16 23   celebrate Christmas or this or that.  It's a completely

14:36:21 24   different atmosphere.

14:36:22 25                   THE COURT:  No birthday gifts?

14:36:26 1                    THE DEFENDANT:  Actually, no.

14:36:27 2                    THE COURT:  All right.  Anything that you want

14:36:31 3       to clarify, Ms. Brooks?

14:36:34 4                    MS. BROOKS:  No, Your Honor.  Thank you.

14:36:36 5                    THE COURT:  Anything the government has to add?

14:36:40 6                    MR. FALGOWSKI:  Your Honor, there are several

14:36:42 7       things.  Our investigation shows that someone, an employee

14:36:49 8       said that in about May of 2022, that Mr. Higgins gave them

14:36:57 9       $25,000 cash as a gift.

14:37:01 10                   Mr. Higgins -- the Court was asking if -- you

14:37:09 11      know, what the assets are, what his assets are, but I

14:37:14 12      believe the Court asked, have you transferred anything to

14:37:17 13      her, but I don't believe the Court asked what assets does

14:37:21 14      your wife own?  What real estate does your wife own in and

14:37:25 15      of itself?  What metals might she own by herself, whether

14:37:30 16      she got it from the defendant or not?  What cash -- what

14:37:34 17      bank accounts does she own or have access to or might be the

14:37:40 18      nominee for?

14:37:41 19                   Mr. Higgins says he hasn't worked since 2012,

14:37:42 20      and in bankruptcy papers, he has said that also, but the

14:37:42 21      investigation shows that from 2012 until the receiver walked

14:37:50 22      in and took control of that business around December of last

14:37:59 23      year, the investigation shows that he was at work virtually

14:38:02 24      every day.  He was dealing with customers every day.  He was

14:38:02 25      writing checks and authorizing wire transfers.  I think what

14:38:10 1    he means when he says I haven't worked since 2012, I think

14:38:15 2    he means that I didn't get a wage, I didn't get W-2 wages.

14:38:20 3    I think what he means is no, I worked, I was doing

14:38:23 4    everything that I did before I stopped taking a wage, so I

14:38:28 5    think that's what he means when he says I haven't worked.

14:38:32 6        But he also says that he hadn't had anything to

14:38:35 7    get no financial benefit, he hasn't gotten any financial

14:38:39 8    benefit from working, but the indictment charges tax evasion

14:38:46 9    for a period of five years, I believe starting in 2015.  And

14:38:51 10    what the sum and substance of that was, up until about 2012,

14:38:56 11    he was paying himself a W-2 wage that went up to as much as

14:39:01 12    maybe pretty close to $150,000 to $200,000.  He stopped

14:39:07 13    paying himself a wage at that time.

14:39:09 14        And the indictment charges from 2014 to '15 for

14:39:12 15    the next five years what he did, he still didn't pay himself

14:39:16 16    a wage, but he paid personal expenses.  His daughter used to

14:39:21 17    be in private school, and he paid -- and the indictment

14:39:26 18    charges basically that he used business expenses in order to

14:39:31 19    pay personal expenses.  And over that five years, the total

14:39:34 20    is probably about $400,000.  And that's what he personally

14:39:39 21    benefited.  He paid off the mortgage to his house over those

14:39:44 22    five years, about $200,000 to pay off his mortgage.  He

14:39:48 23    bought a Hawaiian time share in his own name.  He bought all

14:39:52 24    his groceries and traveled to -- did traveling and all of

14:40:02 25    that would come from his business expenses, and that's what

14:40:07 1    the sum and substance --

14:40:09 2              THE COURT:  I understand that, but when I'm

14:40:11 3    looking at his eligibility, I mean, that -- I understand

14:40:17 4    what the government is asserting, that has to be proved by

14:40:21 5    beyond a reasonable doubt, but even if all of that were

14:40:29 6    true, how is that relevant to his current financial

14:40:32 7    eligibility?

14:40:35 8              MR. FALGOWSKI:  In the event that there is more

14:40:37 9    like that that the government didn't find, you know what I

14:40:40 10   mean, so when he says I didn't benefit, I didn't benefit

14:40:44 11   financially from 2012, I think categorically that's not

14:40:50 12   accurate, to the extent -- and there may be other assets,

14:40:54 13   you know, the government can only guess.

14:40:57 14             One other thing, during the investigation,

14:41:01 15   investigators spoke to two women called the Carusa's and

14:41:07 16   they gave the Defendant about $8 million to invest in metals

14:41:12 17   in March of about a year ago.  This would have been about

14:41:15 18   two months before the indictment was returned.  And we spoke

14:41:19 19   with them, and they indicated, as did the FBI, and they

14:41:25 20   indicated that as part of them investing their $8 million

14:41:30 21   into the business, that they personally spoke with the

14:41:33 22   Defendant, and he said that this was a good investment, that

14:41:36 23   this was a good idea to invest.  And they asked him do you

14:41:44 24   have investments in precious metals and he said he did.  And

14:41:47 25   he said that he is going to use his investment in precious

14:41:53 1   metals in order to buy a home in Hawaii, and that that was a

14:42:00 2   good way in order to arrange that.

14:42:04 3           Now, you know, that's what he told those people,

14:42:07 4   that's what those two investors told us.

14:42:11 5           Now, I think it's fair to say the FBI doesn't

14:42:17 6   have any corroboration that, in fact, he has precious metals

14:42:23 7   he's going to invest in a home, whether it's just puff, but

14:42:26 8   to the extent we're here --

14:42:29 9           THE COURT:  I get it.  I want to, though, be

14:42:31 10  very careful about not asking him things that go to the

14:42:34 11  subject matter of the case before him because that issue is

14:42:38 12  not in front of me.  The eligibility, financial eligibility.

14:42:44 13  And I understand what you're saying and there may be some

14:42:47 14  more questions that I need to ask to ensure that there is

14:42:52 15  not some amount of money that is out there someplace, but if

14:43:02 16  it turns out that he's giving false answers because he has

14:43:06 17  $8 million invested in precious metals, I guess at some

14:43:10 18  point that will come out.

14:43:13 19          MR. FALGOWSKI:  As to the receiver, by the way,

14:43:15 20  the receiver is here in the courtroom, Kelly Crawford, the

14:43:18 21  gentleman seated there.  I didn't invite him, he obviously

14:43:23 22  knew about this, and so he came.  But I have read the papers

14:43:30 23  that have been publicly filed and my understanding is that

14:43:35 24  Judge Andrews has entered an order that Mr. Crawford can

14:43:35 25  sell the house, the West Chester house and that Mr. Crawford

14:43:45 1  has authorization to do that, to get that accomplished.

14:43:49 2          THE COURT:  Okay.  All right.  Thank you.

14:43:51 3          So then let me just follow-up, Mr. Higgins, I

14:43:56 4  asked you did you give any gifts in the last twelve months,

14:44:06 5  and you said, you know, some birthday gifts to your

14:44:11 6  grandchildren.  Any other gifts that you gave?

14:44:14 7          THE DEFENDANT:  In direct comment to the

14:44:17 8  $25,000, that was a loan to be repaid when she re-mortgaged

14:44:22 9  her house back to the company.  She had just gotten

14:44:25 10  separated from who she had been living with for some time,

14:44:30 11  had a lot of overhead, credit card debt, this and that, and

14:44:35 12  I said fine.  She said there is just no way I can redo my

14:44:40 13  mortgage on the house with all of this, so the company

14:44:44 14  loaned her $25,000 with the idea that after two or

14:44:48 15  three months she would then apply to re-mortgage, get a new

14:44:53 16  mortgage and pay the $25,000 back.  And then, of course, all

14:44:59 17  of this happened.

14:45:03 18          THE COURT:  Did she pay the loan back?

14:45:05 19          THE DEFENDANT:  She has not.

14:45:07 20          THE COURT:  Any other loans that you have given?

14:45:09 21          THE DEFENDANT:  That was the only one.

14:45:11 22          THE COURT:  Do you have any property interest in

14:45:15 23  a time share in Hawaii?

14:45:16 24          THE DEFENDANT:  The time share in Hawaii that we

14:45:21 25  have, basically we have not made any payments, I'm going to

14:45:26 1    say for the last five years, and I have been waiting for the

14:45:31 2    day that they basically say hey, you're not paying us.

14:45:36 3         I didn't mention anything to them about it as

14:45:39 4    long as they allowed us to go there and stay for those

14:45:43 5    fourteen days with no charges or anything.  One day it would

14:45:48 6    come that they would somehow make the 2016 Chapter 13, maybe

14:45:57 7    they took that as everything was on hold, I don't know, but

14:46:00 8    I can tell you that yes, we did commit to a time share, we

14:46:04 9    did pay for a short while, and then 2012 there was nothing

14:46:10 10   we could do and so we have been going back visiting, going

14:46:16 11   there, spending the fourteen days there, but have not paid a

14:46:20 12   cent for it.

14:46:22 13        THE COURT:  And you don't have any equity

14:46:24 14   interest in it?

14:46:25 15        THE DEFENDANT:  No.

14:46:26 16        THE COURT:  All right.  I am concerned that the

14:46:35 17   information on this affidavit is not complete or not

14:46:40 18   accurate.  There is, for example, a question number 30,

14:46:44 19   other amounts someone owes you, unpaid wages, disability

14:46:42 20   insurance, disability benefits, sick pay, vacation pay,

14:46:52 21   workers compensation, Social Security benefits, unpaid loans

14:46:52 22   you made to someone else, checked no.

14:46:52 23        THE DEFENDANT:  That was through the company,

14:47:01 24   not me personally.  It is a separate entity.

14:47:07 25        THE COURT:  All right.  Let me ask you this,

14:47:09 1    then.  Does your wife own any property other than your half

14:47:13 2    interest in the house?

14:47:14 3              THE DEFENDANT:  No, she does not.

14:47:16 4              THE COURT:  Does your wife own any precious

14:47:18 5    metals of any kind?

14:47:20 6              THE DEFENDANT:  No, she does not, never has.

14:47:21 7              THE COURT:  The bank account that you mentioned,

14:47:24 8    is the only bank account your wife has is the one, the joint

14:47:27 9    account?

14:47:27 10              THE DEFENDANT:  Correct, the -- well, actually

14:47:30 11    it's her account because of the way when the CFTC said I had

14:47:36 12    to have a separate account, so the account that she has is

14:47:38 13    her personal account of which all of the family, electric

14:47:42 14    bill, telephone, this, that, whatever, all of that is paid

14:47:46 15    out of there.

14:47:47 16              They wanted me to open up a separate account so

14:47:51 17    that they could monitor that because they're allowing me to

14:47:55 18    accept my Social Security, they want to make sure that the

14:47:58 19    only money that is flowing in and out of there is my Social

14:48:02 20    Security.  So the Social Security comes on the third

14:48:02 21    Wednesday of every month.  When that money hits that

14:48:02 22    account, then I basically move it over to into my wife's

14:48:11 23    account as the family account that pays all the bills.

14:48:11 24              THE COURT:  All right.  You said that you were

14:48:11 25    working at the company after 2012, but not drawing an

income.

                    THE DEFENDANT:  Uh-huh.

                    THE COURT:  Were any of the checks that you
wrote on behalf of the company checks to you, wrote to
yourself?

                    THE DEFENDANT:  No.

                    THE COURT:  Did your wife's income at the
company change in any way after you stopped working there?

                    THE DEFENDANT:  My wife, and I said I would tell
the truth, that's what it is, at that point in time I
actually stopped taking a paycheck to myself and started --
my wife was working there and she was drawing a paycheck,
started off around 35,000, maybe went to around 65, 70,000,
so it wasn't as if the family didn't have an income coming
in.  It was my wife who paid taxes and getting Social
Security eligibility.  One day I'm going to pass away, so
rather than me drawing it, okay, she was drawing it and
doing work there.  And so it's still completely -- you know,
with the family account, she got paid taxes on it, she is
W-2, the whole deal.  So I did not take anything over and
above working there because my wife's income was basically
helping us to keep making and paying the bills.

                    THE COURT:  All right.  So what I need now is to
have a revised financial affidavit submitted.  I want it to
be accurate and inclusive, including a meaningful Social

14:50:36  1    Security disclosure.  And I will then make a determination

14:50:41  2    about qualification for CJA, or a public defender, and we'll

14:50:52  3    go from there.

14:50:53  4              THE DEFENDANT:  Thank you, Your Honor.

14:50:54  5              THE COURT:  Thank you.

14:50:55  6              Anything you guys want to add before I leave?

14:50:58  7              MR. FALGOWSKI:  No, Your Honor.

14:50:58  8              MS. BROOKS:  Your Honor, I just wanted to speak

14:51:00  9    to the years of vacations.  As far as I know, he was able to

14:51:04 10    pay our legal bills before the CFTC froze all of his assets.

14:51:10 11    I take ask you to take that into consideration, last October

14:51:12 12    to the present.

14:51:13 13              THE COURT:  Yes, I understand, but in December

14:51:15 14    he went to Hawaii for fourteen days.  Most criminal

14:51:20 15    defendants who are using -- whose counsel is being paid for

14:51:23 16    by the public are not in Hawaii for fourteen days.

14:51:30 17              MS. BROOKS:  Understood, Your Honor.  Thank you.

14:51:31 18              COURT CLERK:  All rise.

         19              (Court adjourned at 2:51 p.m.)

         20

         21              I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the proceeding.
         22

         23                        /s/ Dale C. Hawkins
                                Official Court Reporter
         24                        U.S. District Court

         25

**$**

**$10,000** [1] - 4:20
**$150,000** [1] - 20:12
**$2,100** [1] - 13:20
**$200,000** [2] - 20:12, 20:22
**$230,000** [1] - 4:10
**$25,000** [4] - 19:9, 23:8, 23:14, 23:16
**$400,000** [1] - 20:20
**$5,000** [1] - 11:7
**$900,000** [3] - 4:19, 9:3, 9:18

**'**

**'15** [1] - 20:14
**'22** [1] - 7:3

**/**

**/s** [1] - 27:23

**0**

**0** [6] - 14:7

**1**

**100** [1] - 17:17
**13** [3] - 7:21, 8:18, 24:6
**15th** [1] - 17:3
**1999** [1] - 9:8

**2**

**2,500** [1] - 8:25
**20** [3] - 1:8, 6:21, 18:10
**2012** [13] - 4:22, 6:16, 10:16, 14:6, 15:7, 15:9, 19:19, 19:21, 20:1, 20:10, 21:11, 24:9, 25:25
**2013** [1] - 14:7
**2014** [2] - 6:21, 20:14
**2015** [1] - 20:9
**2016** [1] - 24:6
**2020** [2] - 14:7, 14:9
**2021** [1] - 14:8
**2022** [4] - 3:15, 14:8, 14:25, 19:8
**2023** [1] - 1:8
**22-44-MN** [1] - 2:8
**22-cr-0044(MN** [1] - 1:4
**2:00** [1] - 1:8
**2:51** [1] - 27:19

**3**

**30** [1] - 24:18
**300,000** [1] - 9:21
**35,000** [1] - 26:13
**386,000** [1] - 9:10

**5**

**5th** [1] - 7:2

**6**

**65** [1] - 26:13

**7**

**70,000** [1] - 26:13
**700,000** [1] - 9:22
**75** [1] - 17:17
**7th** [1] - 4:3

**8**

**8** [3] - 21:16, 21:20, 22:17
**844** [1] - 1:10

**A**

**able** [4] - 10:11, 15:10, 15:12, 27:9
**accept** [1] - 25:18
**access** [1] - 19:17
**accomplished** [1] - 23:1
**according** [1] - 12:5
**account** [25] - 11:11, 11:16, 11:18, 11:19, 11:20, 11:21, 11:23, 12:5, 12:6, 12:16, 12:19, 12:22, 12:25, 25:7, 25:8, 25:9, 25:11, 25:12, 25:13, 25:16, 25:22, 25:23, 26:19
**accounts** [6] - 11:7, 11:8, 11:14, 11:16, 15:3, 19:17
**accurate** [5] - 14:19, 21:12, 24:18, 26:25, 27:21
**Action** [2] - 1:4, 2:8
**add** [2] - 19:5, 27:6
**additional** [5] - 4:8, 4:12, 4:20, 6:12
**addressed** [1] - 4:18
**adjourned** [1] - 27:19
**affidavit** [10] - 3:21, 4:15, 4:21, 6:7, 6:16,

7:12, 7:21, 12:8, 24:17, 26:24
**affidavits** [1] - 3:23
**afternoon** [2] - 2:3, 2:5
**ago** [5] - 8:16, 8:21, 10:21, 12:4, 21:17
**Airlines** [3] - 15:16, 15:20, 16:9
**Alex** [1] - 2:9
**ALEXANDER** [1] - 1:18
**allow** [1] - 12:5
**allowed** [1] - 24:4
**allowing** [2] - 3:5, 25:17
**Amendment** [1] - 5:11
**AMERICA** [1] - 1:3
**American** [3] - 15:16, 15:19, 16:9
**amount** [2] - 4:9, 22:15
**amounts** [2] - 4:7, 24:19
**Andrea** [1] - 2:10
**ANDREA** [1] - 1:22
**Andrews** [1] - 22:24
**ANNA** [1] - 1:23
**Anna** [2] - 2:11, 3:1
**annual** [1] - 15:6
**answers** [1] - 22:16
**apologies** [1] - 13:11
**apologize** [5] - 2:15, 2:24, 3:8, 3:9, 12:17
**APPEARANCES** [1] - 1:15
**apply** [1] - 23:15
**appointed** [2] - 2:13, 2:16, 2:22, 2:23, 3:22, 3:24, 8:1
**appointing** [1] - 4:4
**appointment** [4] - 3:23, 4:7, 5:1, 5:7
**approach** [1] - 13:18
**approved** [2] - 3:5, 4:13
**April** [1] - 1:8
**area** [1] - 15:11
**arrange** [1] - 22:2
**asserting** [1] - 21:4
**asset** [2] - 4:19, 9:18
**assets** [6] - 4:20, 19:11, 19:13, 21:12, 27:10
**associate** [1] - 2:10
**assumed** [1] - 7:21
**atmosphere** [1] - 18:24
**attached** [1] - 13:17

**attachment** [1] - 13:12
**attorney** [8] - 2:10, 2:13, 4:4, 4:6, 9:21, 10:8
**ATTORNEY'S** [1] - 1:17
**attorneys** [4] - 9:24, 10:5, 10:6
**authorization** [1] - 23:1
**authorizing** [1] - 19:25
**available** [4] - 11:5, 14:21, 16:12, 17:25

**B**

**bail** [2] - 2:19, 2:21
**bank** [10] - 11:7, 11:8, 11:18, 11:24, 12:1, 12:15, 12:25, 19:17, 25:7, 25:8
**Bank** [1] - 12:3
**bankruptcy** [2] - 8:19, 19:20
**basis** [1] - 9:1
**BEFORE** [1] - 1:12
**behalf** [1] - 26:4
**Belarus** [4] - 4:23, 15:6, 15:14, 15:15
**Belarusian** [1] - 18:22
**belonging** [1] - 15:3
**benefit** [5] - 7:9, 20:7, 20:8, 21:10
**benefited** [1] - 20:21
**benefits** [2] - 24:20, 24:21
**beyond** [1] - 21:5
**big** [2] - 17:16, 17:17
**bill** [1] - 25:14
**bills** [4] - 11:22, 25:23, 26:22, 27:10
**birthday** [1] - 18:10, 18:16, 18:25, 23:5
**blanks** [1] - 13:25
**bonds** [1] - 11:15
**bought** [3] - 9:8, 20:23
**break** [1] - 16:20
**bring** [1] - 6:6
**broadly** [1] - 18:9
**Brooks** [4] - 2:10, 2:12, 4:6, 19:3
**BROOKS** [17] - 1:22, 2:15, 2:19, 2:24, 3:8, 5:16, 5:19, 12:11, 12:14, 13:6, 13:8, 13:13, 13:16, 13:18, 19:4, 27:8, 27:17
**bucks** [2] - 17:18, 18:11
**Buckson** [1] - 5:17

**budget** [4] - 3:1, 3:5, 4:9, 4:10
**bunch** [1] - 7:14
**business** [6] - 7:14, 15:23, 19:22, 20:18, 20:25, 21:21
**buy** [4] - 9:3, 9:7, 9:9, 22:1
**BY** [3] - 1:17, 1:18, 1:22

**C**

**California** [1] - 10:9
**cap** [1] - 4:8
**capacity** [1] - 10:22
**car** [4] - 10:18, 11:1, 11:3, 11:4
**card** [1] - 23:11
**careful** [1] - 22:10
**Carusa's** [1] - 21:15
**case** [5] - 2:25, 4:7, 4:16, 4:17, 22:11
**cash** [2] - 19:9, 19:16
**categorically** [1] - 21:11
**celebrate** [1] - 18:23
**cent** [1] - 24:12
**certain** [1] - 4:16
**certainly** [1] - 5:11
**certify** [1] - 27:21
**CFTC** [8] - 10:23, 12:5, 12:14, 12:15, 12:21, 12:23, 25:11, 27:10
**change** [2] - 8:25, 26:8
**Chapter** [3] - 7:21, 8:18, 24:6
**charges** [4] - 20:8, 20:14, 20:18, 24:5
**checked** [1] - 24:22
**checks** [3] - 19:25, 26:3, 26:4
**Chester** [2] - 10:8, 22:25
**child** [2] - 15:3, 18:20
**children** [1] - 18:13
**choice** [1] - 17:15
**choosing** [1] - 3:24
**Christmas** [1] - 18:23
**civil** [1] - 4:17
**CJA** [7] - 2:22, 3:9, 3:13, 3:22, 4:11, 5:4, 27:2
**clarify** [1] - 19:3
**clear** [2] - 9:18, 9:19
**CLERK** [2] - 5:23, 27:18
**client** [1] - 2:22

**clients** [1] - 9:22
**close** [1] - 20:12
**closed** [2] - 6:22, 7:1
**closely** [1] - 2:25
**co** [1] - 2:9
**co-counsel** [1] - 2:9
**comfortable** [1] - 5:21
**coming** [3] - 13:25, 14:5, 26:14
**comment** [1] - 23:7
**commit** [1] - 24:8
**communications** [1] - 3:1
**company** [10] - 6:24, 6:25, 7:5, 7:10, 23:9, 23:13, 24:23, 25:25, 26:4, 26:8
**compensation** [2] - 4:7, 24:21
**complete** [1] - 24:17
**completed** [1] - 3:21
**completely** [2] - 18:23, 26:18
**concerned** [1] - 24:16
**concerning** [1] - 14:20
**concerns** [1] - 5:14
**conditions** [1] - 3:17
**connection** [1] - 4:16
**consideration** [1] - 27:11
**considered** [2] - 7:20, 7:22
**considering** [1] - 4:14
**continue** [1] - 7:4
**contribute** [1] - 5:2
**control** [2] - 12:23, 19:22
**cook** [1] - 17:12
**copy** [1] - 6:8
**correct** [4] - 6:17, 6:18, 15:7, 25:10
**corroboration** [1] - 22:6
**Cosa** [1] - 4:23
**Costa** [4] - 16:1, 16:17, 16:22
**Counsel** [2] - 1:19, 1:24
**counsel** [14] - 2:9, 2:22, 3:22, 3:23, 3:24, 4:1, 4:8, 4:12, 5:1, 5:7, 7:25, 12:7, 27:15
**country** [1] - 15:24
**counts** [1] - 3:15
**course** [2] - 15:17, 23:16
**COURT** [101] - 1:1, 2:3, 2:12, 2:18, 2:21, 3:4, 3:11, 5:17, 5:21,

5:23, 6:5, 6:10, 6:15, 6:19, 6:23, 6:25, 7:4, 7:9, 7:12, 7:18, 7:23, 8:4, 8:7, 8:12, 8:15, 8:23, 9:2, 9:7, 9:9, 9:11, 9:14, 9:17, 9:23, 10:2, 10:5, 10:11, 10:14, 10:18, 10:20, 10:25, 11:4, 11:7, 11:11, 11:13, 11:17, 11:23, 12:1, 12:7, 13:4, 13:7, 13:17, 13:19, 14:2, 14:6, 14:11, 14:17, 14:23, 15:2, 15:5, 15:13, 15:19, 16:1, 16:4, 16:6, 16:11, 16:17, 16:22, 17:2, 17:7, 17:10, 17:13, 17:19, 17:22, 17:24, 18:3, 18:5, 18:9, 18:13, 18:16, 18:20, 18:25, 19:2, 19:5, 21:2, 22:9, 23:2, 23:18, 23:20, 23:22, 24:13, 24:16, 24:25, 25:4, 25:7, 25:24, 26:3, 26:7, 26:23, 27:5, 27:13, 27:18
**Court** [11] - 1:13, 2:7, 4:5, 4:9, 13:12, 19:10, 19:12, 19:13, 27:19, 27:23, 27:24
**Court's** [2] - 2:17, 3:2
**courtroom** [1] - 22:20
**COVID** [1] - 15:9
**Crawford** [3] - 22:20, 22:24, 22:25
**credit** [1] - 23:11
**Criminal** [2] - 1:4, 2:8
**criminal** [1] - 27:14
**Crypto** [1] - 18:3
**currency** [1] - 18:3
**current** [8] - 10:6, 11:8, 12:8, 12:12, 14:19, 18:14, 18:20, 21:6
**customers** [1] - 19:24

## D

**Dale** [1] - 27:23
**date** [2] - 8:9, 8:10
**daughter** [2] - 17:19, 20:16
**David** [1] - 4:4
**days** [7] - 10:21, 16:4, 17:9, 24:5, 24:11, 27:14, 27:16
**deal** [1] - 26:20

**dealing** [1] - 19:24
**debt** [1] - 23:11
**December** [4] - 6:16, 17:3, 19:22, 27:13
**defendant** [2] - 5:5, 19:16
**DEFENDANT** [82] - 6:1, 6:9, 6:14, 6:18, 6:20, 6:24, 7:2, 7:6, 7:11, 7:17, 7:19, 8:2, 8:5, 8:8, 8:13, 8:20, 8:25, 9:5, 9:8, 9:10, 9:13, 9:15, 9:19, 9:25, 10:3, 10:7, 10:13, 10:16, 10:19, 10:21, 11:2, 11:6, 11:9, 11:12, 11:15, 11:19, 11:25, 12:3, 12:13, 13:23, 14:4, 14:10, 14:13, 14:21, 14:24, 15:4, 15:8, 15:15, 15:22, 16:3, 16:5, 16:8, 16:13, 16:20, 16:24, 17:3, 17:8, 17:11, 17:15, 17:21, 17:23, 18:2, 18:4, 18:7, 18:10, 18:14, 18:19, 18:21, 19:1, 23:7, 23:19, 23:21, 23:24, 24:15, 24:23, 25:3, 25:6, 25:10, 26:2, 26:6, 26:9, 27:4
**Defendant** [5] - 1:6, 1:24, 2:9, 21:16, 21:22
**defendants** [1] - 27:15
**defender** [1] - 27:2
**defense** [1] - 5:3
**definition** [1] - 18:8
**DELAWARE** [1] - 1:2
**Delaware** [1] - 1:11
**deposited** [1] - 13:3
**determination** [1] - 27:1
**different** [2] - 10:6, 18:24
**dinner** [2] - 17:10, 17:14
**direct** [1] - 23:7
**disability** [2] - 24:19, 24:20
**disclose** [1] - 13:22
**disclosed** [1] - 13:5
**disclosure** [2] - 12:2, 27:1
**dissipated** [1] - 17:6
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 1:13, 27:24

**docket** [1] - 4:15
**document** [1] - 14:12
**documents** [2] - 4:16, 4:22
**done** [4] - 3:25, 15:7, 15:8, 15:24
**double** [1] - 14:14
**doubt** [1] - 21:5
**down** [2] - 6:22, 7:1
**draw** [1] - 7:7
**drawing** [4] - 25:25, 26:12, 26:17
**drive** [5] - 10:20, 10:23, 10:25, 11:1
**driver's** [1] - 10:22
**drove** [1] - 10:23
**duly** [1] - 6:3
**during** [2] - 16:20, 21:14

## E

**earnings** [1] - 13:15
**eat** [3] - 17:12, 17:15, 17:16
**eater** [1] - 17:17
**Edelman** [1] - 3:2
**EDMOND** [1] - 1:17
**Edmond** [1] - 2:6
**efficiency** [1] - 3:6
**eight** [1] - 15:25
**electric** [1] - 25:13
**eligibility** [7] - 3:13, 7:25, 21:3, 21:7, 22:12, 26:16
**eligible** [3] - 4:25, 5:6, 14:18
**employed** [2] - 6:19, 6:20
**employee** [1] - 19:7
**end** [1] - 8:22
**ensure** [2] - 5:4, 22:14
**entered** [3] - 2:20, 3:5, 22:24
**entity** [1] - 24:24
**equity** [3] - 9:14, 10:12, 24:13
**Esq** [1] - 4:4
**ESQ** [4] - 1:17, 1:18, 1:22, 1:23
**estate** [1] - 19:14
**estimate** [1] - 11:8
**European** [1] - 18:21
**evasion** [2] - 3:15, 20:8
**event** [1] - 21:8
**exactly** [1] - 8:3
**examined** [1] - 6:4
**example** [1] - 24:18
**exercise** [1] - 5:6

**expenses** [4] - 20:16, 20:18, 20:19, 20:25
**extent** [4] - 4:24, 5:2, 21:12, 22:8

## F

**fact** [1] - 22:6
**fair** [1] - 22:5
**FALGOWSKI** [7] - 1:17, 2:5, 5:15, 19:6, 21:8, 22:19, 27:7
**Falgowski** [1] - 2:6
**false** [1] - 22:16
**family** [9] - 4:22, 11:16, 11:19, 16:18, 18:6, 25:13, 25:23, 26:14, 26:19
**far** [3] - 7:6, 9:19, 27:9
**Fargo** [1] - 9:13
**FBI** [2] - 21:19, 22:5
**February** [3] - 3:20, 4:3, 12:12
**fees** [1] - 4:18
**felt** [1] - 14:25
**few** [1] - 10:21
**Fifth** [1] - 5:11
**fifty** [2] - 9:15, 9:17
**figure** [1] - 13:2
**filed** [2] - 3:16, 22:23
**filing** [2] - 7:21, 8:11
**fill** [2] - 7:24, 8:4
**filled** [1] - 8:20
**financial** [18] - 3:13, 3:21, 3:23, 4:15, 4:24, 5:9, 6:7, 6:15, 7:9, 7:20, 7:25, 12:2, 12:8, 20:7, 21:6, 22:12, 26:24
**financially** [4] - 4:25, 5:6, 14:18, 21:11
**fine** [2] - 2:22, 23:12
**Firm** [1] - 4:8
**firm** [3] - 2:23, 3:18, 4:6
**first** [7] - 3:9, 12:11, 12:16, 12:17, 14:5, 17:21, 18:15
**FISCELLA** [3] - 1:23, 13:11, 13:14
**Fiscella** [3] - 2:11, 3:1, 13:8
**five** [7] - 15:25, 18:15, 20:9, 20:15, 20:19, 20:22, 24:1
**flowing** [1] - 25:19
**follow** [1] - 23:3
**follow-up** [1] - 23:3
**follows** [1] - 6:4
**FOR** [1] - 1:2

foregoing [1] - 27:21
form [1] - 7:20
forty [2] - 15:25
forty-eight [1] - 15:25
forty-five [1] - 15:25
fourteen [1] - 17:9,
   24:5, 24:11, 27:14,
   27:16
frame [1] - 8:9
free [3] - 5:12, 9:18,
   9:19
freeze [1] - 12:21
front [2] - 6:9, 22:12
froze [2] - 12:15,
   27:10
frozen [1] - 12:22
full [1] - 5:24
funds [8] - 3:13, 4:11,
   5:5, 9:11, 11:21,
   15:13, 16:6, 17:13

**G**

gentleman [1] - 22:21
gift [1] - 19:9
gifts [8] - 18:5, 18:8,
   18:17, 18:20, 18:25,
   23:4, 23:5, 23:6
given [6] - 5:1, 8:11,
   9:3, 18:5, 18:18,
   23:20
glasses [1] - 6:6
gold [1] - 17:24
gosh [1] - 10:16
Gotlieb [1] - 10:9
GOTLIEB [1] - 10:9
government [5] -
   12:24, 19:5, 21:4,
   21:9, 21:13
grandchildren [3] -
   18:11, 18:17, 23:6
great [1] - 17:12
groceries [1] - 20:24
guess [3] - 18:7,
   21:13, 22:17
guilty [1] - 3:17
guys [1] - 27:6

**H**

H-I-G-G-I-N-S [1] - 6:2
H2 [1] - 10:23
half [1] - 25:1
hand [1] - 5:24
handle [2] - 2:14, 2:16
handled [2] - 2:19,
   2:21
handling [1] - 3:1
Hawaii [5] - 22:1,
   23:23, 23:24, 27:14,

27:16
Hawaiian [1] - 20:23
Hawkins [1] - 27:23
Hearing [1] - 1:9
hearing [1] - 2:6
hearings [2] - 2:19,
   2:21
heavily [1] - 13:9
help [1] - 11:21
helping [1] - 26:22
hereby [1] - 27:21
herself [1] - 19:15
HIGGINS [2] - 1:5, 6:3
Higgins [17] - 2:8,
   3:14, 3:16, 3:18,
   3:20, 4:1, 4:4, 4:17,
   4:19, 5:8, 5:10, 5:18,
   6:1, 19:8, 19:10,
   19:19, 23:3
Higgins' [4] - 2:13,
   3:13, 4:15, 4:24
high [2] - 17:19, 17:21
himself [3] - 20:11,
   20:13, 20:15
hits [1] - 25:21
hold [1] - 24:7
home [4] - 17:12,
   17:16, 22:1, 22:7
honestly [2] - 8:8,
   8:13
Honor [22] - 2:5, 2:15,
   2:17, 2:24, 3:8, 3:10,
   5:15, 5:16, 5:19,
   12:11, 12:17, 13:6,
   13:8, 13:11, 13:16,
   14:25, 19:4, 19:6,
   27:4, 27:7, 27:8,
   27:17
HONORABLE [1] -
   1:12
hotel [1] - 17:1
hotels [3] - 15:18,
   16:9, 16:15
house [18] - 4:19, 9:3,
   9:4, 9:5, 9:7, 9:8,
   9:14, 9:16, 10:4,
   10:11, 10:12, 10:15,
   20:21, 22:25, 23:9,
   23:13, 25:2
Hyatt [5] - 16:8, 16:11,
   16:25

**I**

IBRAHIM [1] - 1:18
Ibrahim [1] - 2:9
idea [2] - 21:23, 23:14
implicate [1] - 5:11
implications [1] - 3:7
IN [1] - 1:1

included [1] - 7:18
includes [1] - 4:11
including [3] - 4:11,
   18:6, 26:25
inclusive [1] - 26:25
income [5] - 4:22,
   7:13, 7:18, 13:22,
   13:24, 26:1, 26:7,
   26:14, 26:21
indicate [1] - 4:22
indicated [2] - 21:19,
   21:20
indicating [1] - 14:24
indicted [1] - 3:14
indictment [5] - 3:16,
   20:8, 20:14, 20:17,
   21:18
individual [5] - 11:13,
   11:18, 11:20, 11:23
individually [1] - 12:6
indulgence [1] - 3:3
information [4] -
   14:19, 14:20, 15:6,
   24:17
instructed [1] - 12:24
insurance [1] - 24:20
intend [1] - 5:10
interest [3] - 23:22,
   24:14, 25:2
invest [3] - 21:16,
   21:23, 22:7
invested [1] - 22:17
investigation [4] -
   19:7, 19:21, 19:23,
   21:14
investigators [1] -
   21:15
investing [1] - 21:20
investment [2] -
   21:22, 21:25
investments [1] -
   21:24
investors [1] - 22:4
invite [1] - 22:21
issue [2] - 7:24, 22:11
issued [1] - 4:3
issues [1] - 4:18
itself [1] - 19:15

**J**

job [1] - 14:23
joint [3] - 11:11,
   11:14, 25:8
jointly [1] - 9:6
judge [1] - 3:25
Judge [2] - 1:13,
   22:24
judgment [3] - 10:1,
   10:3, 10:14

June [2] - 16:2, 16:3

**K**

keep [1] - 26:22
Kelly [1] - 22:20
kind [3] - 7:21, 16:15,
   25:5
King [1] - 1:10

**L**

last [10] - 16:2, 16:3,
   16:23, 16:24, 17:4,
   18:6, 19:22, 23:4,
   24:1, 27:11
LAW [1] - 1:22
law [1] - 3:18
Law [1] - 4:8
leave [2] - 5:3, 27:6
legal [1] - 27:10
less [2] - 3:24, 11:9
letter [2] - 12:12,
   12:17
level [1] - 3:25
license [1] - 10:22
lien [2] - 10:2, 10:14
life [1] - 3:9
limited [1] - 5:4
list [2] - 4:19, 11:7
listed [4] - 9:2, 9:5,
   12:2, 13:9
litigation [1] - 12:21
living [1] - 23:10
LLC [1] - 1:22
loan [2] - 23:8, 23:18
loaned [1] - 23:14
loans [2] - 23:20,
   24:21
Lohr [1] - 10:7
looking [1] - 21:3

**M**

magistrate [1] - 3:25
major [1] - 12:18
March [1] - 21:17
marked [1] - 8:10
MARYELLEN [1] -
   1:12
matter [2] - 12:14,
   22:11
Maui [4] - 16:25, 17:2,
   17:7, 17:8
mean [6] - 9:23, 13:20,
   13:21, 21:3, 21:10
meaningful [1] - 26:25
means [4] - 20:1, 20:2,
   20:3, 20:5
member [1] - 18:6

memory [1] - 8:14
mention [1] - 24:3
mentioned [1] - 25:7
metals [8] - 17:25,
   19:15, 21:16, 21:24,
   22:1, 22:6, 22:17,
   25:5
might [2] - 19:15,
   19:17
mileage [2] - 16:10,
   16:12
miles [4] - 15:16,
   15:19, 15:20, 15:22
million [3] - 21:16,
   21:20, 22:17
minute [1] - 6:6
mom [1] - 15:17
moment [2] - 16:13,
   18:12
money [5] - 14:5, 15:3,
   22:15, 25:19, 25:21
monies [1] - 12:23
monitor [1] - 25:17
month [5] - 3:16, 8:16,
   8:21, 13:21, 25:21
monthly [2] - 8:24, 9:1
months [7] - 7:13,
   8:21, 12:4, 12:15,
   16:23, 16:24, 18:6,
   21:18, 23:4, 23:15
mortgage [8] - 9:13,
   9:16, 9:20, 20:21,
   20:22, 23:13, 23:15,
   23:16
mortgaged [1] - 23:8
most [1] - 27:14
move [1] - 25:22
MR [6] - 2:5, 5:15,
   19:6, 21:8, 22:19,
   27:7
MS [18] - 2:15, 2:19,
   2:24, 3:8, 5:16, 5:19,
   12:11, 12:14, 13:6,
   13:8, 13:11, 13:13,
   13:14, 13:16, 13:18,
   19:4, 27:8, 27:17

**N**

name [2] - 5:24, 20:23
need [5] - 6:6, 11:3,
   22:14, 26:23
never [2] - 18:4, 25:6
new [4] - 12:4, 12:25,
   23:15
next [1] - 20:15
nine [2] - 16:4, 18:11
nineteen [1] - 15:24
nominee [1] - 19:18
none [1] - 5:16

**NOREIKA** [1] - 1:12
**normally** [1] - 17:11
**note** [2] - 4:19, 4:21
**notes** [1] - 27:21
**nothing** [3] - 12:18, 14:13, 24:9
**number** [2] - 14:6, 24:18

## O

**oath** [2] - 5:8, 5:18
**object** [1] - 5:12
**objections** [1] - 5:14
**obligation** [1] - 5:4
**obviously** [1] - 22:21
**October** [2] - 7:2, 27:11
**OF** [2] - 1:2, 1:3
**OFFICE** [1] - 1:17
**Official** [1] - 27:23
**official** [1] - 14:1
**often** [1] - 17:10
**once** [2] - 12:21, 17:11
**one** [10] - 9:21, 11:16, 13:14, 14:16, 18:14, 21:14, 23:21, 24:5, 25:8, 26:16
**ongoing** [1] - 9:20
**online** [1] - 14:16
**open** [3] - 12:4, 12:25, 25:16
**operates** [1] - 11:19
**operating** [1] - 11:16
**order** [8] - 2:23, 3:5, 4:3, 4:5, 20:18, 22:1, 22:2, 22:24
**ordered** [1] - 2:7
**overhead** [1] - 23:11
**owe** [4] - 9:21, 9:22, 9:23, 9:24
**owes** [1] - 24:19
**own** [9] - 10:18, 17:25, 19:14, 19:15, 19:17, 20:23, 25:1, 25:4
**owned** [1] - 9:6
**owner** [2] - 9:15, 9:17

## P

**p.m** [2] - 1:8, 27:19
**page** [1] - 14:15
**paid** [9] - 16:9, 20:16, 20:17, 20:21, 24:11, 25:14, 26:15, 26:19, 27:15
**paper** [1] - 14:4
**papers** [2] - 19:20, 22:22
**paralegal** [1] - 4:13

**part** [2] - 15:12, 21:20
**particularly** [1] - 7:24
**pass** [2] - 13:16, 26:16
**past** [1] - 7:13
**pause** [1] - 4:24
**pay** [10] - 11:21, 20:15, 20:19, 20:22, 23:16, 23:18, 24:9, 24:20, 27:10
**paycheck** [2] - 26:11, 26:12
**paying** [4] - 20:11, 20:13, 24:2, 26:22
**payment** [1] - 4:18
**payments** [3] - 7:16, 8:24, 23:25
**pays** [1] - 25:23
**pending** [1] - 4:17
**Pennsylvania** [1] - 10:8
**people** [1] - 22:3
**percent** [2] - 9:15, 9:17
**period** [1] - 20:9
**permission** [1] - 2:17
**personal** [4] - 4:20, 20:16, 20:19, 25:13
**personally** [3] - 20:20, 21:21, 24:24
**place** [1] - 5:17
**placing** [1] - 5:8
**pleading** [1] - 3:17
**point** [5] - 6:21, 11:10, 17:5, 22:18, 26:10
**points** [5] - 16:8, 16:10, 16:11, 16:12, 16:25
**possession** [1] - 10:24
**prearranged** [1] - 17:4
**precious** [6] - 17:25, 21:24, 21:25, 22:6, 22:17, 25:4
**present** [4] - 2:8, 2:9, 8:6, 27:12
**presented** [2] - 7:20, 8:6
**presents** [1] - 18:17
**pretty** [1] - 20:12
**print** [2] - 14:14, 14:16
**printout** [2] - 14:1, 14:25
**private** [1] - 20:17
**problem** [1] - 14:17
**proceeding** [1] - 27:21
**profession** [1] - 7:14
**properly** [1] - 5:5
**property** [3] - 4:20, 23:22, 25:1
**proposal** [1] - 5:13

**propose** [1] - 5:6
**proved** [1] - 21:4
**public** [4] - 5:3, 17:22, 27:2, 27:16
**publicly** [1] - 22:23
**puff** [1] - 22:7
**purposes** [1] - 3:6
**put** [1] - 10:15

## Q

**qualification** [1] - 27:2
**questions** [5] - 3:12, 5:9, 5:14, 6:13, 22:14

## R

**raise** [1] - 5:23
**rather** [2] - 5:3, 26:17
**re** [2] - 23:8, 23:15
**re-mortgage** [1] - 23:15
**re-mortgaged** [1] - 23:8
**read** [1] - 22:22
**real** [1] - 19:14
**really** [1] - 17:16
**reasonable** [2] - 11:8, 21:5
**recap** [1] - 3:14
**receive** [4] - 7:15, 8:24, 8:25, 14:8
**received** [3] - 7:13, 15:16, 15:19
**receiver** [5] - 12:20, 12:25, 19:21, 22:19, 22:20
**receiving** [2] - 13:25, 14:2
**recognize** [1] - 18:12
**record** [1] - 5:25
**recorded** [1] - 14:8
**redo** [1] - 23:12
**regular** [1] - 4:22
**regularly** [1] - 16:19
**related** [1] - 3:15
**released** [1] - 3:17
**relevant** [1] - 21:6
**remember** [1] - 8:8
**Renee** [1] - 3:2
**reopened** [1] - 12:20
**repaid** [1] - 23:8
**Reporter** [1] - 27:23
**represent** [2] - 3:19, 8:2
**representing** [1] - 9:22
**request** [3] - 4:13, 4:14, 5:7

**requested** [3] - 4:6, 4:9
**required** [1] - 5:2
**resources** [1] - 5:2
**restrictions** [1] - 15:10
**result** [1] - 13:2
**retained** [3] - 2:23, 3:18, 4:1
**retainer** [1] - 4:18
**returned** [1] - 21:18
**reverse** [1] - 14:13
**review** [1] - 5:7
**reviewed** [1] - 4:14
**revised** [1] - 26:24
**Rica** [5] - 4:23, 16:1, 16:17, 16:22
**rise** [2] - 5:23, 27:18
**ROBERT** [3] - 1:5, 6:1, 6:3
**Robert** [2] - 2:7, 6:1, 10:7
**rooms** [1] - 16:9
**running** [1] - 15:23

## S

**salary** [1] - 7:8
**scheduled** [1] - 3:12
**school** [4] - 17:20, 17:21, 17:22, 20:17
**seated** [2] - 2:4, 22:21
**second** [1] - 14:15
**Security** [16] - 7:16, 8:24, 11:20, 12:5, 12:19, 13:3, 13:5, 13:14, 14:3, 14:9, 24:21, 25:18, 25:20, 26:16, 27:1
**see** [4] - 3:22, 8:9, 8:10, 13:25
**seeking** [1] - 14:17
**seeks** [1] - 4:10
**seem** [1] - 8:8
**sell** [2] - 10:11, 22:25
**sent** [1] - 12:11
**separate** [3] - 24:24, 25:12, 25:16
**separated** [1] - 23:10
**several** [1] - 19:6
**share** [4] - 20:23, 23:23, 23:24, 24:8
**short** [2] - 3:14, 24:9
**show** [1] - 14:18
**showed** [1] - 15:1
**showing** [1] - 13:24
**shows** [5] - 14:5, 15:23, 19:7, 19:21, 19:23
**sick** [1] - 24:20
**side** [2] - 13:14, 14:14

**silver** [1] - 17:24
**sister** [2] - 15:11, 15:17
**situation** [3] - 4:25, 5:9, 9:20
**Social** [16] - 7:15, 8:24, 11:20, 12:5, 12:19, 13:3, 13:5, 13:14, 14:2, 14:8, 24:21, 25:18, 25:19, 25:20, 26:15, 26:25
**social** [1] - 14:1
**someone** [4] - 6:6, 19:7, 24:19, 24:22
**someplace** [1] - 22:15
**somewhat** [1] - 16:18
**soon** [1] - 4:5
**sorry** [1] - 13:8
**sources** [1] - 7:15
**spell** [1] - 5:24
**spending** [1] - 24:11
**spouse** [1] - 6:19
**spring** [1] - 16:20
**stand** [1] - 5:20
**start** [1] - 14:2
**started** [5] - 13:24, 15:9, 16:21, 26:11, 26:13
**starting** [1] - 20:9
**starts** [1] - 13:24
**state** [1] - 5:24
**states** [1] - 4:21
**STATES** [3] - 1:1, 1:3, 1:17
**States** [4] - 1:13, 1:19, 2:6, 2:7
**stay** [3] - 5:22, 15:17, 24:4
**staying** [2] - 16:15, 16:25
**stenographic** [1] - 27:21
**still** [3] - 16:11, 20:15, 26:18
**stocks** [1] - 11:15
**stopped** [4] - 20:4, 20:12, 26:8, 26:11
**Street** [1] - 1:10
**stuff** [1] - 16:15
**subject** [1] - 22:11
**submitted** [8] - 3:20, 4:10, 4:16, 8:15, 12:7, 12:9, 12:16, 26:24
**submitting** [1] - 13:12
**substance** [2] - 20:10, 21:1
**substitute** [1] - 3:6
**sum** [2] - 20:10, 21:1
**superseding** [1] - 3:16

**sworn** [1] - 6:3

## T

**table** [1] - 2:8
**tax** [2] - 3:15, 20:8
**taxes** [2] - 26:15, 26:19
**telephone** [1] - 25:14
**testified** [1] - 6:4
**THE** [183] - 1:1, 1:2, 1:12, 2:3, 2:12, 2:18, 2:21, 3:4, 3:11, 5:17, 5:21, 6:1, 6:5, 6:9, 6:10, 6:14, 6:15, 6:18, 6:19, 6:20, 6:23, 6:24, 6:25, 7:2, 7:4, 7:6, 7:9, 7:11, 7:12, 7:17, 7:18, 7:19, 7:23, 8:2, 8:4, 8:5, 8:7, 8:8, 8:12, 8:13, 8:15, 8:20, 8:23, 8:25, 9:2, 9:5, 9:7, 9:8, 9:9, 9:10, 9:11, 9:13, 9:14, 9:15, 9:17, 9:19, 9:23, 9:25, 10:2, 10:3, 10:5, 10:7, 10:11, 10:13, 10:14, 10:16, 10:18, 10:19, 10:20, 10:21, 10:25, 11:2, 11:4, 11:6, 11:7, 11:9, 11:11, 11:12, 11:13, 11:15, 11:17, 11:19, 11:23, 11:25, 12:1, 12:3, 12:7, 12:13, 13:4, 13:7, 13:17, 13:19, 13:23, 14:2, 14:4, 14:6, 14:10, 14:11, 14:13, 14:17, 14:21, 14:23, 14:24, 15:2, 15:4, 15:5, 15:8, 15:13, 15:15, 15:19, 15:22, 16:1, 16:3, 16:4, 16:5, 16:6, 16:8, 16:11, 16:13, 16:17, 16:20, 16:22, 16:24, 17:2, 17:3, 17:7, 17:8, 17:10, 17:11, 17:13, 17:15, 17:19, 17:21, 17:22, 17:23, 17:24, 18:2, 18:3, 18:4, 18:5, 18:7, 18:9, 18:10, 18:13, 18:14, 18:16, 18:19, 18:20, 18:21, 18:25, 19:1, 19:2, 19:5, 21:2, 22:9, 23:2, 23:7, 23:18, 23:19, 23:20, 23:21,

23:22, 23:24, 24:13, 24:15, 24:16, 24:23, 24:25, 25:3, 25:4, 25:6, 25:7, 25:10, 25:24, 26:2, 26:3, 26:6, 26:7, 26:9, 26:23, 27:4, 27:5, 27:13
**thereafter** [1] - 4:5
**third** [1] - 25:20
**three** [4] - 4:12, 8:21, 16:21, 23:15
**Thursday** [1] - 1:8
**today** [2] - 3:4, 5:14
**together** [2] - 2:10, 13:2
**took** [3] - 10:24, 19:22, 24:7
**total** [1] - 20:19
**trade** [1] - 15:23
**trading** [1] - 7:7
**transcript** [1] - 27:21
**transfer** [1] - 11:21
**transferred** [2] - 15:2, 19:12
**transfers** [1] - 19:25
**travel** [1] - 15:5
**traveled** [1] - 20:24
**traveling** [3] - 15:23, 16:14, 20:24
**trial** [1] - 4:11
**trip** [3] - 15:6, 15:14, 16:17
**trips** [3] - 4:23, 15:15, 15:21
**true** [2] - 21:6, 27:21
**truth** [1] - 26:10
**turns** [1] - 22:16
**twelve** [5] - 7:13, 16:23, 16:24, 18:6, 23:4
**two** [8] - 4:7, 4:12, 8:21, 12:4, 21:15, 21:18, 22:4, 23:14
**type** [1] - 18:22

## U

**U.S** [1] - 27:24
**under** [2] - 5:8, 5:18
**understood** [1] - 27:17
**UNITED** [3] - 1:1, 1:3, 1:17
**United** [4] - 1:13, 1:19, 2:6, 2:7
**unpaid** [2] - 24:19, 24:21
**up** [12] - 5:20, 6:21, 7:10, 10:21, 12:4,

13:16, 15:9, 16:16, 20:10, 20:11, 23:3, 25:16
**update** [1] - 13:1
**updated** [1] - 12:16

## V

**vacation** [1] - 24:20
**vacations** [2] - 16:23, 27:9
**value** [1] - 9:3
**vehicle** [1] - 10:23
**virtually** [1] - 19:23
**Visa** [1] - 15:12
**visiting** [1] - 24:10

## W

**W-2** [3] - 20:2, 20:11, 26:20
**wage** [5] - 20:2, 20:4, 20:11, 20:13, 20:16
**wages** [2] - 20:2, 24:19
**waiting** [1] - 24:1
**waiver** [1] - 4:6
**walk** [2] - 5:20, 6:11
**walked** [1] - 19:21
**website** [1] - 14:22
**Wednesday** [1] - 25:21
**weekend** [1] - 17:11
**Wells** [1] - 9:13
**West** [2] - 10:7, 22:25
**whole** [2] - 7:14, 26:20
**wife** [16] - 9:6, 11:17, 15:3, 17:12, 17:16, 18:14, 18:15, 18:20, 19:14, 25:1, 25:4, 25:8, 26:9, 26:12, 26:15
**wife's** [4] - 15:11, 25:22, 26:7, 26:21
**WILKS** [1] - 1:22
**Wilks** [8] - 2:16, 2:17, 2:23, 2:25, 3:18, 3:21, 4:4, 4:8
**Wilks'** [1] - 4:6
**Wilmington** [1] - 1:11
**wire** [1] - 19:25
**witness** [1] - 5:20
**women** [1] - 21:15
**workers** [1] - 24:21
**writing** [1] - 19:25
**wrote** [2] - 26:4

## Y

**year** [8] - 3:20, 4:3,

8:22, 14:7, 17:5, 17:21, 19:23, 21:17
**years** [8] - 15:25, 16:21, 20:9, 20:15, 20:19, 20:22, 24:1, 27:9
**yourself** [1] - 26:5

# **EXHIBIT B**

# **FILED UNDER SEAL**




WIO: 23062 3427 003749          RECORD: 164678          TITLE: 85653885 7 MI          03/05/2023

23062 3427 003749

Vitu PA

# Pennsylvania Department of Transportation Applicant Summary Statement

Transaction: N Title Only          Processor:                          Processed By: MAG - Maribel Gonzalez
Purchase Date: 3/3/23          Process Date: 3/3/23                Temp Tag Date:
Prev Title No:          Prev Dup Title Count:                        State of Origin: NY

VIN:                          Condition: F          Unladen Weight:          Chassis Mfr:
Yr/Make: 2006 HUMMER          Body: SW                      GVWR:          Body Make:
Odom Reading:          Fuel: GAS/G                    GCWR:          Seat Cap:
Odom Qual: EXEMPT BY FED LAW/4          Purch Prc: 11,500.00          No of Axles:
Brands:

Owner Information          Lessee Information          Insurance Information
                    WIGGINS/S          [ ] Tenant in          OWNER/OWNER/OWNER/O          /
                              Survivorship?          /
                              [X] Tenant in
                              Common
                              [ ] Retired
                              [ ] OOTF
                              [ ] VTF

Disabled Veteran:

Trade In #1 Information          Lien Holder #1 Information          Fees & Sales Tax Information          PennDOT Fees
VIN:          ABA:                    Tax exempt Reason:                    Sales/Use Tax: 690.00
YR:                              Tax Exempt No:                    Motor Veh. Fees: 58.00
Make:                              Taxable Sale Price: 11,500.00          Other Fees: 0.00
Condition:                              Sales tax credit: 0.00          Total: 748.00
Allowance:                              Override Code:
Trade In #2:          Lien Holder #2:          [ ] ELT          Amount Waived: 0.00
Allowance:

Assigned Tag Type: PASSENGER/01          Class:          Assigned Exp Sticker No: -
Assigned Tag No:          Reg. GVW:          Class Sticker No:          [ ] W/Renewal
Assigned Exp Date:          Reg. GCW:          Transferred Title No:          [ ] W/Tag Repl
Signature of Person From Whom Tag Is Being Transferred:          Transferred Tag No:          [ ] W/Tag Exch
                                        Relation To Applicant:
                                        No of Dup Reg Cards: 0

I/we acknowledge that I/we may lose my/our operating privilege(s) or vehicle registration(s) for failure to maintain financial responsibility on the currently registered vehicle for the period of registration. I/we further acknowledge that I/we may be subject to a fine not exceeding $5,000 and imprisonment of not more than two (2) years for any false statement that I/we make on this form, and I/we certify that I/we have examined and signed this form after its completion; and that if an exemption from payment of sales tax is claimed, I am/we are authorized to claim this exemption. I/we further certify that all statements herein are true and correct and make application for certificate of title for the vehicle described above.

Date Subscribed and Sworn to:          Signature of Applicant or Authorized Signer:
03/03/2023

Signature of Notary          Commonwealth of Pennsylvania - Notary Seal          Signature of Co-Owner/Title or Authorized Signer:
S          Maria Alvarado-Gonzalez. Notary Public
E          Delaware County          [ ] VIN/GVWR Certification or Tracing is Required
A          My commission expires December 16, 2023          Place Signature of Person Verifying VIN/GVWR or the Tracing here:
L          Commission number 1265777          I hereby certify that I have verified the VIN/GVWR of
          Member, Pennsylvania Association of Notaries          SIGN:          the VIN/GVWR listed above is correct          DIN: 18 9733

VOID          VOID

VOID          VOID

**ANY CHANGE OR ERASURE WILL VOID THIS TITLE -- ANY FALSE STATEMENT IS A MISDEMEANOR**

## SECTION I - Transfer by Owner

**ODOMETER DISCLOSURE STATEMENT**

*Note: This vehicle cannot be registered or titled in the name of the new owner unless mileage is disclosed.*

Federal and State Law require that you state the mileage of the vehicle described on this certificate when transferring ownership. Failure to do so, or providing a false statement, may result in fines and/or imprisonment.

I certify that, to the best of my knowledge, this odometer reading *(check one):*
- ☐ 1. reflects the ACTUAL MILEAGE as seen on the odometer of the vehicle described on the front.
- ☐ 2. EXCEEDS MECHANICAL LIMITS (odometer started over at zero)
- ☐ 3. not the actual mileage. WARNING - ODOMETER DISCREPANCY.

**ODOMETER READING**

EXEMPT

*(no tenths)*

**ODOMETER HAS SPACE FOR:** *(Check one)*
- ☐ Five Digits, *excluding tenths*
- ☐ Six Digits, *excluding tenths*

**DAMAGE DISCLOSURE STATEMENT (To be Completed by Owner Named on Face of Title)**

I certify that, to the best of my knowledge, this vehicle ☐ has been or ☒ has not been wrecked, destroyed or damaged to such an extent that the total estimate or actual cost of parts and labor to rebuild or reconstruct the vehicle to the condition it was in before an accident, and for legal operation on the road or highways, is more than 75% of the retail value of the vehicle at the time of loss. (Checking the "has" box means that the vehicle must have an anti-theft examination before being registered and that the title issued will have the statement "Rebuilt Salvage: NY" on it.)

I or we transfer the vehicle, boat or manufactured home described on this certificate. At the time of transfer, this title is subject only to the liens or encumbrances listed on this certificate, if any. I also certify that this is the most recent title issued for this vehicle, boat or manufactured home.

*Note: Section 2113 of the Vehicle and Traffic Law requires that application for a title must be made within 30 days of transfer.*

| | | | | |
|---|---|---|---|---|
| **Seller** Sel███ | City | Seller's Name *(Print in Full)* | ZIP code | Date of Statement 3/2/23 |
| Street Address ████ | | State | | |
| **Buyer** Buyer's Signature ████ | City WEST CHESTER | Buyer's Name *(Print in Full)* HIGGINS | ZIP code 19382 | Date of Statement 03-02-2023 |
| Street Address ████ | | State PA | | |

## SECTION II - Reassignment by Manufactured Home Dealer or Registered Boat Dealer or Out-of-State Dealer

**ODOMETER DISCLOSURE STATEMENT**

*Note: This vehicle cannot be registered or titled in the name of the new owner unless mileage is disclosed.*

Federal and State Law require that you state the mileage of the vehicle described on this certificate when transferring ownership. Failure to do so, or providing a false statement, may result in fines and/or imprisonment.

I certify that, to the best of my knowledge, this odometer reading *(check one):*
- ☐ 1. reflects the ACTUAL MILEAGE of the vehicle described on the front.
- ☐ 2. EXCEEDS MECHANICAL LIMITS (odometer started over at zero)
- ☐ 3. not the actual mileage. WARNING ODOMETER DISCREPANCY.

**ODOMETER READING**

*(no tenths)*

**ODOMETER HAS SPACE FOR:** *(Check one)*
- ☐ Five Digits, *excluding tenths*
- ☐ Six Digits, *excluding tenths*

I or we transfer the vehicle, boat or manufactured home described on this certificate. At the time of transfer, this title is subject only to the liens or encumbrances listed on this certificate, if any. I also certify that this is the most recent title issued for this vehicle, boat or manufactured home.

*Note: Section 2113 of the Vehicle and Traffic Law requires that application for a title must be made within 30 days of transfer.*

| | | | | |
|---|---|---|---|---|
| **Seller** Seller's Signature | City | Seller's Name *(Print in Full)* | ZIP code | Date of Statement |
| Street Address | | State | | |
| **Buyer** Buyer's Signature | City | Buyer's Name *(Print in Full)* | ZIP code | Date of Statement |
| Street Address | | State | | |

Boat Dealer's Facility #

MV-999 (1/15)     L 8577735

# **EXHIBIT C**

# **FILED UNDER SEAL**



**DEPARTMENT OF THE TREASURY**
**Internal Revenue Service**
**Criminal Investigation**

**Memorandum of Interview**

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000304130 | **Location:** | Telephone Call ▮▮▮▮ |
| **Investigation Name:** | Robert Higgins | | |
| **Date:** | April 26, 2023 | | |
| **Time:** | 02:55PM-03:15PM | | |
| **Participant(s):** | — | | |

Antonino Lo Piccolo, Special Agent, IRS-CI

On the above date and approximate time, Special Agent Lo Piccolo introduced himself to ▮▮▮▮ (hereinafter "▮▮▮▮") and ▮▮▮▮ (hereinafter "▮▮▮") as an IRS-CI Special Agent and advised them of an investigation of ROBERT HIGGINS (hereinafter "HIGGINS") and his businesses.  They voluntarily provided the following information:

1.  ▮▮▮▮ (Phone number ▮▮▮▮) confirmed she is the prior owner of a Hummer H2 sold to HIGGINS in March of 2023.  ▮▮▮ stated her daughter called her and informed her someone from the IRS had stopped by her house earlier in the day regarding the vehicle sale.  ▮▮▮ advised that she had no previous contact or association with HIGGINS prior to the sale.  The vehicle was posted for sale on Marketplace and HIGGINS responded to the posting.  ▮▮▮'s boyfriend, ▮▮▮▮, negotiated the sale with HIGGINS.

2.  ▮▮▮▮ advised $19,500 was the original sale price.  The final sale price was $17,500.  ▮▮▮ stated that HIGGINS offered to pay for the vehicle with gold.  HIGGINS claimed to be an international metal and coins dealer doing over $3 Million a year in deals.  ▮▮▮ stated that on March 1st, HIGGINS sent him a text listing gold HIGGINS was set to receive via FedEx.  HIGGINS claimed to have 4 1-Ounce Gold Eagle coins, 3 1-Ounce Gold Buffalo coins, and 1-Ounce Credit Suisse gold bars to make payment.  HIGGINS son accompanied him to New York.  HIGGINS brought a briefcase containing a "shit load" of gold bars and coins.  ▮▮▮ would not accept the gold from HIGGINS.  HIGGINS told ▮▮▮ the sale should be done in gold, because gold was untraceable and ▮▮▮ could make money on his gold investment.

3.  After ▮▮▮ declined to complete the sale in cash, HIGGINS visited multiple banks, including a Wells Fargo, to obtain $11,500 in cash.  ▮▮▮ accepted the partial payment as it was the amount needed to pay-off ▮▮▮ car loan with Sunmark.  HIGGINS was supposed to pay the balance owed ▮▮▮

from the sale of the gold.  HIGGINS identified platform.gold as a metal wholesaler he does business with in New York.  HIGGINS has not paid |_____ any additional money.

4. HIGGINS claimed he paid a mechanic $4,000 to make repairs after he bought the vehicle. |_____ the title to the car.  HIGGINS has threatened to not pay |_____ the balance as he already has the title. |_____ recalled HIGGINS' wife is Russian.  HIGGINS claimed to have purchased a 1,000 bottle collection of wines from 1947 through 1985 for $1.3 Million from an estate sale.

5. |_____ sent texts to HIGGINS at |_____.

I prepared this memorandum on April 26, 2023, after refreshing my memory from notes made during and immediately after the interview with |_____ and |_____.

Antonino Lo Piccolo
Special Agent

# <u>EXHIBIT D</u>

# FILED UNDER SEAL

most importance be-
ing that it is a 10 hr
round trip drive. Are
you ok with providing
this information

Fri, Feb 24 at 4:13 PM

Hello
What's your thought
being paid in gold ?

Like how much in
cold

# <u>EXHIBIT E</u>

# FILED UNDER SEAL

**4 Photos**



# #1 1/2 Oz American



#1 1/2 Oz American Gold Eagles $953
#2 1 Oz Credit Susie Gold Bar $1842
#3 1 Oz American Gold Buffalo $1875
#4. 1 Oz American Gold Eagle $1877

These are the values 1/2 are a little more cost factor but give you the option like having a $100 dollar bill or a $50. So if you want to sell and don't

# **EXHIBIT F**

# **FILED UNDER SEAL**

